JUDGB BUELITT
DELIVERED THE OPINION OP THE COURT:
In July and November, 1654, and February, 1855, the Cov-ington and Lexington Railroad Company issued certain bonds, called by them, and by persons dealing in them, “income bonds,” of which the following is a specimen:
“The Covington and Lexington Railroad Company acknowledges itself indebted to Samuel J. Walker or bearer in the sum of five hundred dollars, negotiable and payable at the Paris Branch of Ihe Northern Bank of Kentucky, five years after date, bearing interest from date at the rate of 10 per cent, per annum, payable semi-annually on the first day of May and November, at the said Bank, on the delivery of the proper coupon, being part of an authorized issue of $200,000. For *188 the redemption of this certificate, and the payment of the interest, the property, rights, credits and income of said company is irrevocably pledged. In witness whereof,” &c.
None of these bonds were secured by any recorded deed. A number of them were sold to various persons prior to March, 1856.
In June, 1855, said company executed a mortgage, which was duly recorded, to J. Winslow, trustee, to secure the payment of certain bonds, called by persons dealing in them “third mortgage bonds,” the company having made two previous mortgages. In March, 1856, and afterward, the appellee, Val-lette, purchased a number of said third mortgage bonds. In a suit brought fey one Winslow against Vallette and others, the road and other property of the company were sold for payment of its debts, under an order of the court below, and a contest arose betweeiT holders of “income bonds,” and Vnl-lettee, as the holder of “third mortgage bonds,” concerning their rights to priority of payment out of the proceeds of the company’s property. The court below having decided that Vallette was entitled to priority, Willis and other holders of “income bonds” filed petitions for a new trial, upon the alleged ground that, after the term at which the decision was rendered, they had discovered material evidence which they could not with reasonable dilligence have produce at the trial. This appeal was taken from an order dismissing those petitions.
1. The principal question is, whether or not the newly discovered evidence is sufficient, in connection with that produced on the original trial, to show that Vallette, when he purchased the “third mortgage bonds,” had notice of the sale of the income bonds, and of the fact that the holders thereof had a lien on the property of the company.
For the appellee it is contended that there is a distinction, as to the notice necessary to bind a purchaser, between cases which do not come within the operation of t.he registry acts and those which do; that, in the former, constructive or implied notice may suffice, whilst in the latter there must be clear and undoubted proof of actual notice; that this doctrine *189 was established by the English courts under the statute of 7 Anne, ch. 20, by which it was declared that unregistered deeds should be deemed “fraudulent and void against any subsequent purchaser for a valuable consideration,” and that our Legislature, in declaring that unrecorded deeds shall be void against “any purchaser for a valuable consideration not having notice thereof,” intended to establish as a rule of positive law the equitable doctrine established in England under the statute of Anne; and that, “if the income bonds operate on their face as conventional liens on the railroad, then these liens are like legal mortgages, and comes within the policy and are subject to the provisions of the registry acts.”
After a careful examination of the subject, our opinion is, that the distinction contended for is not founded in reason, nor sustained by the weight of authority, English or American, and that it has never been recognized in this State, but was in effect rejected in the case of Morton vs. Robards, (4 Dana; 258,) and several other cases decided by this court. The law applicable to this case is, in our opinion, correctly stated in the following passages, taken from Kent’s Commentaries, and from an opinion of Vice Chancellor Wigram:
“The Statute of New York postpones an unregistered deed or mortgage only as against a purchaser or mortgager in good faith and for a valuable consideration; and this lets in the whole of the English equity doctrine of notice. The statute law of many of the other States is not so latitudinary in terms; and deeds not recorded are declared void as to creditor’s and subsequent purchasers; and in some cases they are declared to convey no title, or to be void as against all other persons but the grantor and his heirs. The doctrine of notice and its operation in favor of the prior unregistered deed or mortgage equally applies however, as I apprehend, throughout the United States, and it everywhere turns on a question of fraud, and on the evidence requisite to infer it. In pursuance of that principle, and in order to support, at the same time, the policy and injunctions of the registry acts in all their vigor and meauing} implied notice may be equally effectual with direct and positive notice; but then it must not be that notice which is bare *190 ly sufficient to put a party upon inquiry. Suspicion of notice is not sufficient. The inference of a fraudulent intent affecting the conscience, must be founded on clear and strong circumstances, in the absence of actual notice. The inference must be necessary and unquestionable. Though the cases use very strong language in favor of explicit certain notice, yet it is to be understood as the true construction of the rule on the subject, that implied or presumptive notice maybe equivalent to actual notice.” (4 Com., 171.) “The general doctrine is, that whatever puts a party upon inquiry amounts in judgment of law to notice, provided the inquiry becomes a duty, as in the case of purchasers and creditors, and would lead to the knowledge of the requisite fact, by the exercise oí ordinary diligence and understanding.” (4 Com., 179.)
“Cases in which constructive notice has been established resolve themselves into two classes: first, cases in which the party charged has had actual notice that the property in dispute was, in fact, charged incumbered or in some way affected; and the court has thereupon bound him with constructive notice of facts and instruments, to a knowledge of which he would have been led by an inquiry after the charge, incumbrance or other circumstance affecting the property of which he had actual notice; and, secondly, cases in which the court has been satisfied from the evidence before it, that the party charged had designedly abstained from inquiry for the very purpose of avoiding notice.
“The proposition of law upon which the former class of eases proceeds, is not that the party charged had notice of a fact or instrument, which, in truth, related to the subject in dispute, without his knowing that such was the case; but that he had actual notice that it did so relate. The proposition of Haw upon which the second class of cases proceeds, is, not that the party charged had incautiously neglected to make inquiries; but that fee had designedly abstained from such inquiries, for the purpose of avoiding knowledge — a purpose, which, if proved, would clearly show that he had a suspicion of the truth, and a fraudulent determination not to learn it. In short if there is not actual notice that the property is in some way *191 affected and no fraudulent turning away from a knowledge of facts which the res gestee would suggest to a prudent mind — if mere want of caution, as distinguished from fraudulent and willful blindness, is all that can be imputed to the purchaser, there the doctrine of constructive notice will not apply, there the purchaser will, in equity, be considered, as in fact he is, a bona fide purchaser without notice.” (Jones vs. Smith, 1 Hare, 55.)
Upon the original hearing it was proven that Vallette was a retired banker, residing in Cincinnati, which furnished the principal market for the sale of the securities of the Covington and Lexington R. R. Company; that he was in the habit of dealing in stocks, and of frequenting bankers’ and brokers’ offices, where those securities were sold; that in 1854 and 1855 “income bonds” were frequently sold, and ■ advertised for sale in newspapers and bankers’ bulletins in Cincinnati; and that the principal office of said company was at Covington, opposite to Cincinnati, on the other side of the Ohio river. The newly discovered evidence, relied on by the appellants, consists of the facts, that, in April, 1855, Mr. Rennick, of the firm of Loker, Rennick & Co., of St. Louis, having a claim upon a Cincinnati firm, that had stopped payment, was offered “income bonds” in settlement, and after consulting with Vallette and others hetooktwoof said bondsfor$l,000 each,of the issue of December, 1854; that Vallette advised Rennick to take them, because of the location of the road and its probable connections, which would in his opinion make it a paying road, and that he said that, in his opinion, the bonds might eventually be paid; that Vallette, when advising Rennick to take the bonds, said he had never seen one of them, and asked Ren-nick, if he got one, to let him see it, but Rennick thinks he neglected to show them to him; that on the 8th Ma}', 1855, Vallette wrote to Loker, Rennick & Co., advising them to dispose of. the bonds; that on the 11th May, 1855, they sent him the bonds to be disposed of by him according to his judgment; that he placed them for sale in the hands of Hewson & Holmes, brokers in Cincinnati, who sold them on the 31st May, 1855; and that Vallette, on the 8th June, 1855, remitted the proceeds to Loker,.Rennick.& Co.
*192 It is proved, however, by six witnesses, (one of them a broker, four of them bankers,) who resided in Cincinnati, and dealt in these bonds, that in 1855-6 no one there regarded them as giving a lien on the property of the company; and Rennick testifies that neither he nor Vallette, nor any one else whom he consulted, regarded them as giving a lien; and there is no evidence that any one there did so regard them. The impression concerning them probably grew out of the fact, proved by one of the witnesses, that under the law of Ohio these bonds would not have given a lien even against a purchaser having notice of their contents. That Vallette did not regard them as giving a lien is proved by Rennick and by Valletta’s letter of May 8th, 1855, in which, after speaking of the mortgage debt of the company, he says, “it will depend on the income of the business of the road whether those (income) bonds will be good or worthless.” But it is contended that he is legally chargeable with notice of the lien, though he had no knowledge of its existence, if he had notice, actual or constructive, of the contents of the bonds. We incline to the opinion that such is the law; and that if Vallette knew that these bonds pledged the property of the company, he is charge-gable with notice of the lien, though, under a mistake of the law, he may have supposed there was no lien.
To show that Vallette had actual notice of the contents of these bonds, it is urged that we must assume that he read one of the two which he received in May, 1855, or that he had previously read one at some office in Cincinnati, as he might easily have done, because in March, 1855, he expressed to Rennick a desire to see one of them. To give to that expres sion the effect contended for, it must appear, or be assumed, that it was not merely an expression of idle curiosity, but that it was an expression of a real desire to examine the bond in order to ascertain the character of the security,1 and that this desire was based upon some motive which may have probably induced Vallette to carry it into effect. It does not appear that he purchased any of the securities of the Covington & Lexington Railroad Company, or contemplated doing so, or had any personal interest with reference to them, prior to March, *193 1856. His motive, if he had any, for examining one of these bonds, may have ceased to exist before he saw one. If he had had any real motive or desire to see one, he would probably have gone at once to one of the offices he was in the habit of frequenting, instead of awaiting the chances of Rennick’s getting one. In March, 1855, his only apparent interest with reference to these bonds was as the friend of Rennick. That interest would have prompted him to see the bond before advising Rennick to take it, if his object was to examine its contents and learn the character of the security. The fact that he advised Rennick to take it, without seeing it, conduces to prove that he did not consider an examination of its contents at all material in determining its value, and that his opinion concerning its value was based upon information derived from persons in Cincinnati who were dealing in these bonds, and who, according to the proof, did not regard them as giving a lien. That he felt any real interest or made any particular examination to ascertain the contents of these bonds, is rendered quite improbable by his letter of June 8, 1855, in which he speaks of them as “Cincinnati, Covington and Lexington Railroad Bonds.” His misdescription of the name of the company certainly furnishes strong reason to believe that he did not at that time feel much interest nor possess much knowledge as to the character or contents of its bonds. The fact that in 1856 he invested over $65,000 in the purchase of third mortgage bonds, at their market value, is also entitled to weight. It seems improbable that he would have done so without consulting a Kentucky lawyer as to the income bonds, if he had known that the y contained upon their face a pledge of the company’s property; and equally improbable that he would have done so if he had consulted a Kentucky lawyer. The facts, in our opinion, authorize nothing more than a suspicion, a doubtful conjecture, that Vallette had actual notice of the contents of these bonds.
To show that he had constructive notice of their contents two points are relied on:
First. It is contended that “the term income bonds itself imported that the income, and consequently the property of the- *194 company, out of which it issued, was pledged or in some way affected thereby.” We doubt whetherthe term “income bond” imports anything more than a bond payable out of income; and we doubt whether the bond of a company, payable out of its income, and without other words importing a pledge of its income or property, would give a lien thereon. But we need not decide these questions, because, even conceding the legal meaning of the term to be such as is contended for, it does not appear to have been so understood in Cincinnati by any one in 1855-6. On the contrary, it was generally regarded, as we •have already shown, as importing the non-existence of a lien. Moreover, Vallette’s letter of May 8,1855, shows that he then had knowledge of the mortgage bonds previously issued, and regarded them as giving a lien on the company’s property. It was natural for him to suppose that there was a difference between the mortgage bonds and the income bonds; and that as the former gave a lien, the latter did not. We cannot, therefore, decide that his knowledge of the name of these bonds makes him chargeable with constructive notice of their contents.
Secondly. It is contended, that, as Vallette undertook to dispose of the two bonds for Loker, Rennick & Co., it was his duty to examine their contents in order to ascertain their character and value, and that, therefore, he is chargeable with notice of their contents. This argument would, perhaps, not be deemed conclusive, even if Vallette had never heard of the bonds before receiving them from Loker; Rennick & Co., because an agent is only chargeable with constructive notice of those facts which he would have been led to a knowledge of by performing his duty according to the regular course of business. If Vallette had never heard of these bonds before receiving them, it would have been his duty to inquire of persons familiar with them concerning their value and the propriety of disposing of them at their market price; and we •doubt whether he would have been bound to do anything more in the way of inquiry. But before receiving them he ¡had formed an opinion, based on the assumption that they gave no lien, concerning their value and the propriety of dis *195 posing of them at their market price; and these facts were known to Loker, Rennick & Co., when they sent him the bonds. We are, therefore, of the opinion that he was not bound, as agent, to examine their contents, and that he fully performed his duty by placing them with Hewson & Holmes for sale.
We might perhaps have regarded the proof in this case sufficient to charge Vallette with notice, if it had appeared that he purchased the third mortgage bonds for less than their market value, or that he took them as security for a pre-existing debt, or that he had any other motive for turning away from knowledge of the lien given by the income bonds. But it-does not appear that he had such motive. The fact that he-could easily have informed himself of the contents of the income bonds, and that he acted incautiously and negligently if he failed to do so, cannot render him liable to the appellants, who were equally incautious and negligent in failing to obtain recorded evidence of their lien.
' 3. It is contended that Walker, from whom Vallette purchased most of his third mortgage bonds, had notice of the lien of the income, and that Vallette is affected by the notice to Walker. The general rule, that a purchaser without notice is not affected by notice to his vendor, is admitted by counsel; but it is contended that this case does not come within the rule, because Vallette was only a purchaser of the bonds secured by the mortgage; that “the evidence of the debt and th,e security of the mortgage must not be confounded. As to the one, the subsequent purchaser can get a better title than the party he buys from; as to the other he cannot.” This position seems untenable. It is well settled, in equity, with reference to debts secured by mortgage, that the debt is the principalj* thing and the mortgage amere incident thereto; that a trans-j fer of the debt passes the mortgager’s interest in the mort-J gaged property; and that his transfer of the mortgage, with-1 out the debt, passes nothing. (Southern vs. Wendover, 5 N. Hamp., 420; Wilson vs. Troup, 2 Cowan, 195; Jackson vs. Bronson, 19 John., 325.) In equity, therefore, Vallette occupies as favorable a position as if the title conveyed by the third mort *196 gage had been transferred to him by deed when he purchased the bonds; and having purchased without notice he is not affected'by notice to his vendors.
4' It is contended that Winslow, the trustee under the third mortgage, had notice of the lien given by the income bonds, and that Vallette is affected thereby. We need not decide whether Winslow had such notice or not; nor whether he should be regarded as the agent or trustee for the purchasers -of the third mortgage bonds, within the meaning of the rule which charges the principal with notice to his agent and the beneficiary with notice to his trustee; because Winslow’s knowledge as to the income bonds had no connection with the third mortgage, but was acquired in 1854, long before the third mortgage was made or contemplated, and consequeutly cannot affect the bond-holders under that mortgage. (2 Lead. Eq. Cases, Am. Ed., 106, 116-117.)
The facts connected with the second and third points above considered were before the court.at the time of the original trial, and would have furnished no ground for a new trial if decision upon them had been erroneous, (18 B. Mon., 97-8; 3 Met. K. R., 469-70,) and need not have been considered by us but for the alleged facts, (alleged in argument, not in the pleadings,) that several of the appellants were not parties to the original suit, and consequently that the judgment therein is void as against them; and that others of them were only constructively summoned, and consequently are entitled to a re-trial, under section 445 of the Code.
The questions just mentioned we need not decide, because, even conceding that the judgment is void as against some of the appellants, and that others of them were entitled to a retrial, and that their petitions for a new trial may respectively be treated as petitions to recover money received by Vallette under a void judgment, and as motions for are-trial; yet as, in our opinion, upon all the facts now presented, and considering them as if there had been no judgment in the case, Vallette is entitled to the money, the petitions of all the appellants were properly dismissed.
The judgment is affirmed.