### THE COUNTY OF GALVESTON v. J. C. GORHAM.

1. CONSTITUTIONAL LAW—TAXATION.—The occupation tax imposed upon wholesale merchants by the act of 1873 was valid, and not in conflict with the Constitution of the United States.

2. TAXATION—ACTION.—A tax was imposed by the Legislature, and, in the ordinary course of business, paid by persons taxed, without any question having been made as to its illegality, or the irregularity of the collection of that part of it claimed by the county. In a suit to recover back a portion of the tax claimed to have been illegally assessed : *Held*—

    1. That the plaintiffs did not have the right to bring their suit at any time within two years to recover back that portion of the tax claimed to be illegal.

    2. The tax being voluntarily paid, it was not, under the circumstances, contrary to good conscience for the county to retain it.

    3. It was not contrary to good conscience to retain it, because the county and its officers were at no fault, and guilty of no turpitude in receiving and disposing of it under color of a law which was regarded and acted on by all parties as valid at the time it was paid and disposed of.

    4. To allow an action to recover the money back, would work an injury to the county by the cost of the suit, the payment of interest and expense of litigation, and the additional expense of collecting and paying it out, and the consequent derangement of the fiscal affairs of the county, which would result in one party sustaining a damage, annoyance, and trouble, when both parties were equally innocent, and both equally at fault, when the payment was made.

3. MISTAKE.—When money is paid under a mutual mistake of law, the mistake of law is, in and of itself, no ground for recovering it back.

4. DISTINGUISHED.—This case distinguished from the case of City of Marshall *v.* Snediker, 25 Tex., 460.

APPEAL from Galveston.

J. C. Gorham instituted this suit in the District Court of Galveston county to recover from appellant the sum of $2,240, being the amount of the county occupation taxes which had been by plaintiff and certain other persons paid to the county of Galveston, as wholesale merchants, during the years 1872, 1873, 1874, 1875, and 1876.

The claims of the other persons against the county, or their right of action for the recovery of the taxes paid by them respectively, as choses in action, were sold and transferred by them to plaintiff in the court below before the institution of this suit, and before their presentation to the Commissioners' Court for payment.

The validity of this sale and transfer, as a matter of law and fact, was conceded by the defendant in the court below.

Appellant pleaded a general demurrer; also, the two and four years' statutes of limitation, and a general denial.

A jury was waived, and the cause submitted to the judge upon an agreed statement of facts, which were substantially as follows: That the taxes sued for had been levied and collected by the appellant from appellee, and those whose claims had been assigned to him, as a tax for pursuing the occupation of wholesale merchants, and who were engaged during the time stated in the petition in buying and selling, in Galveston, goods, wares, and merchandise of every variety; that the goods, wares, and merchandise bought and sold by them were not exclusively of the manufacture of this State, but were for the most part the product and manufacture of other States and of foreign nations; that there are persons in this State who are manufacturers of goods of various kinds, who sell exclusively the goods manufactured by them in this State; that all the taxes sued for, except the sum of $175, were collected by the appellant more than two years before the commencement of this suit, the sum of $175 having been collected within two years prior to the institution of this suit, and that the claims sued on were presented to the Commissioners' Court of Galveston county for allowance, and were rejected by it. The court overruled the demurrer, and sustained the plea of the two years' statute of limitation to all of the claims sued for except the sum of $175, for which amount judgment was rendered against appellant.

From this judgment the county of Galveston appealed.

The following propositions of law were by agreement submitted for the decision of the court, viz.:

I. Does the third section of the act of the Legislature of the State of Texas, entitled "An act regulating taxation," approved June 3, 1873, and under which the tax for which the judgment was rendered was collected, discriminate in favor of wholesale merchants who buy and sell goods, wares, and merchandise that are exclusively of the manufacture of this State, and against wholesale merchants who buy and sell goods, wares, and merchandise not exclusively of the manufacture of this State?

II. Is the third section of the act of the Legislature of the State of Texas, entitled "An act regulating taxation," approved June 3, 1873, in so far as it imposes an occupation tax upon wholesale merchants, a regulation of commerce, and repugnant to the Constitution of the United States?

III. Can the appellee recover in this suit without showing that there was a wholesale merchant in this State who bought and sold exclusively goods manufactured in this State, or that there is a wholesale merchant doing business in this State who is not liable to pay the tax complained of?

IV. Can suit for the recovery of money paid be maintained by appellee against appellant on the ground of the unconstitutionality of the law under which the tax was collected, without showing that payment was made under protest or under compulsion?

The appellee contends for the affirmative of each of the above propositions, and the appellant for the negative.

*Walter Gresham,* for appellant.

I. The third section of the act of June 3, 1873, does not discriminate between wholesale merchants who buy and sell goods, wares, and merchandise that are exclusively of the manufacture of this State, and wholesale merchants who buy and sell goods, wares, and merchandise not exclusively of the manufacture of this State.

1st. The proviso complained of does not refer to the occupation of a wholesale merchant. (Foster v. Champlin, 29 Tex., 27; United States v. Dickson, 15 Pet., 165; Potter's Dwarris on Stats. and Consts., 274.)

2d. Whenever an act of the Legislature can be so construed and applied as to avoid conflict with the Constitution, and give it the force of law, such construction will be adopted by the court. (Sutherland v. De Leon, 1 Tex., 302–304; Orr v. Rhine, 45 Tex., 354; Legal Tender Case, 12 Wall., 531; Cooley's Const. Lim., 185, and cases there cited; Sedgwick on Construction of Stats. and Const. Law, 552; Potter's Dwarris on Stats. and Consts., 145; Atchison v. Bartholow, 4 Kan., 131.)

II. The tax act approved June 3, 1873, in so far as it imposes an occupation tax upon wholesale merchants, is not a regulation of commerce, and repugnant to the Constitution of the United States.

III. The appellee cannot maintain this suit without showing that there is a wholesale merchant in Galveston county who buys and sells exclusively goods manufactured in this State, or that he has been in some way damaged by the alleged exemption. (Cooley's Const. Lim., 163, 164, and authorities there cited.)

IV. Where one has paid the amount of taxes assessed against him, he cannot recover it back upon the ground of the illegality of the tax, if there be no proof that he was compelled to pay any portion thereof by duress of his person or seizure, actual or threatened, of his property, or that any part thereof was paid under protest. Such payment is deemed voluntary. (Smith v. Readfield, 27 Maine, 145; Barrett v. City of Cambridge, 10 Allen, 48; Walker v. St. Louis, 15 Mo., 563; Phillips v. Jefferson Co., 5 Kan., 412; Union Bank v. New York, 51 Barb., 159; Elliott v. Swartwout, 10 Pet., 137.)

It is immaterial in such case that the law is unconstitutional. (Taylor v. Board of Health, 31 Penn., 73; Barrett v. Cambridge, 10 Allen, 48.)

*L. E. Trezevant,* for appellee.

1. The payment of the tax in question was compulsory, under the act entitled "An act to regulate the assessment and collection of taxes," secs. 28, 29, approved May 31, 1873.

Appellee has, therefore, the right to recover back the tax. (City of Marshall *v.* Snediker, 25 Tex., 460; Baker *v.* Panola Co., 30 Tex., 86; City of Galveston *v.* Sydnor, 39 Tex., 236; First National Bank *v.* Watkins, 21 Mich., 483; Gayner *v.* Egremont, 3 Cush., 567.)

2. The third section of the act entitled "An act regulating taxation," approved June 3, 1873, in so far as it imposes a tax upon persons pursuing the occupation of buying and selling goods, wares, and merchandise, or merchants, * * is a regulation of commerce, and is repugnant to section 1 of article 8, paragraph 4, of the Constitution of the United States. (Welton *v.* The State, 1 Otto, 275.)

ROBERTS, CHIEF JUSTICE.—This is an appeal from a judgment of the District Court, in which appellee recovered back occupation taxes paid to the collector of county taxes by appellee and others, as wholesale merchants, doing business as such in the county of Galveston.

It has been advanced to a hearing out of its order, under rule 59 of this court, with propositions presented and agreed to, authorities cited, and arguments made by the parties, the whole being printed together, in accordance with said rule.

The first proposition is as follows:

"Does the third section of the act of the Legislature of the State of Texas, entitled 'An act regulating taxation,' approved June 3, 1873, and under which the tax, for which the judgment was rendered, was collected, discriminate in favor of wholesale merchants who buy and sell goods, wares, and merchandise that are exclusively of the manufactures of this State, and against wholesale merchants who buy and sell goods, wares, and merchandise not exclusively of the manufactures of this State?"

It is contended by appellee, in support of the judgment rendered in his favor, that "the third section of an act entitled 'An act regulating taxation,' approved June 3, 1873, in so far as it imposes a tax upon persons pursuing the occupation of buying and selling goods, wares, and merchandise, or merchants, is a regulation of commerce, and is repugnant to article 8 of section 1, paragraph 4, of the Constitution of the United States," citing Welton *v.* State of Missouri, 1 Otto, 275.

The Constitution of 1869, under which the law referred to was passed, provides, that "taxation shall be equal and uniform throughout the State. All property in the State shall be taxed in proportion to its value, to be ascertained as directed by law, except such property as two-thirds of both houses of the Legislature may think proper to exempt from taxation. The Legislature shall have power to levy an income tax, and to tax all persons pursuing any occupation, trade, or profession: *Provided*, That the term occupation shall not be construed to apply to pursuits either agricultural or mechanical." (Paschal's Dig., p. 1127, General Prov. Const., art. 12, sec. 19.) This was inserted in the Constitution of 1845, and in every other Constitution of this State that has been adopted up to the present time.

The law of 1873 levied an *ad-valorem* tax upon property, to be assessed on all of the property in the State, including merchandise, possessed by each individual, firm, or corporation, with certain exceptions, on the first day of January of each year, and an occupation tax upon the numerous occupations therein designated by name, description, or definition, omitting any taxation upon incomes. The third section of said act, so far as it is necessary to be herein copied, reads as follows:

"Section 3. That there shall be levied on and collected from every person, firm, or association of persons pursuing any of the following-named occupations, an annual tax (except when herein otherwise provided) on every such occupa-

tion or separate establishment, as follows:   *   *   *   *   *
"From every wholesale merchant, an annual tax of twenty-
five dollars; from every first-class retail merchant, an annual
tax of twenty dollars." The act proceeds to levy a tax on
the second, third, and fourth classes of retail merchants, of
fifteen, ten, and five dollars, and defines the classes by the
amounts of their annual purchases, fixing that of a wholesale
merchant the highest, at one hundred thousand dollars, and
then proceeds to define the occupation of a merchant, as fol-
lows: "A merchant is any person or firm engaged in buying
and selling goods, wares, or merchandise of any kind what-
ever." Immediately following this definition of a merchant
is the following, as a distinct sentence: "Every person, firm,
or association of persons selling goods by sample, card, or
otherwise, shall pay a tax of fifty dollars annually to the
State, and five dollars to each county in which he may sell
goods: provided, no person, firm, or association of persons
selling exclusively goods manufactured in this State, shall be
considered a merchant." (General Laws, 1873, p. 201, 202.)
Said act, in section 4, authorized the County Court to levy
taxes equal to one-half of the State taxes, in pursuance to a
provision in the Constitution to that effect, which, having
been levied and collected, is the money sought to be recov-
ered back in this suit, and for which the judgment appealed
from has been rendered against the county of Galveston.

The portion of the act which it is claimed to render the
occupation tax of twenty-five dollars imposed on wholesale
merchants void, as being violative of the Constitution of the
United States, is the proviso in the distinct sentence last
quoted: "Every person, firm, or association of persons selling
goods by sample, card, or otherwise, shall pay a tax of fifty
dollars annually to the State, and five dollars to each county
in which he may sell such goods: provided, no person, firm,
or association of persons selling exclusively goods manufac-
tured in this State, shall be considered a merchant."

It is contended, that this proviso relates back to, and quali-

fies, the preceding sentence, in which wholesale merchants are defined and taxed, and is a regulation of commerce to their prejudice, by discriminating against them to the extent of thirty-seven dollars and a half annually, inasmuch as they buy and sell goods, wares, and merchandise by the wholesale, including those manufactured in other States of the Union, thereby intrenching upon the powers of government exclusively delegated to the Federal government by a provision in the Constitution, which reads as follows:

"Section VII. The Congress shall have power * * * To regulate commerce with foreign nations, and among the several States, and with the Indian tribes." (Const. U. S., Paschal's Dig., p. 5.) The decision of the Supreme Court cited by counsel in support of this view of the case was made upon a statute of the State of Missouri, levying an occupation tax upon peddlers, making it a penal offense for them to peddle without a license, and defining a peddler as follows, to wit: "Whoever shall deal in the selling of patent or other medicines, goods, wares, or merchandise, except books, charts, and stationery, which are not of the growth, product, or manufacture of this State, by going from place to place to sell the same, is declared to be a peddler." In deciding this case, it was said that "no license is required for selling in a similar way, by going from place to place in the State, goods which are the growth or product of the State." Or, in other words, a person who is a peddler in fact of such articles in the State, pays no taxes for the occupation of peddling. That is, in effect, to levy a tax upon goods not of the growth and product of the State, because of their foreign origin, upon being brought into the State and sold by a peddler, which is a regulation of commerce between the States, within the power of Congress on this subject, thereby being prohibited from being exercised by the States, either directly or indirectly, as was, in effect, done by that law of the State of Missouri. And it had this effect, because a license tax levied upon the peddler selling goods introduced from another State

was indirectly a tax upon those goods, not on account of the quality or kind of them, but because of their foreign origin, being articles of commerce, passing from other States into the State of Missouri, and being there sold by a peddler; and Congress not having exercised its power to regulate commerce among the several States, its non-exercise is equivalent to a declaration by that body that such commerce shall be free from any restrictions.

The transportation and exchange of commodities from one State to another, before the adoption of the Constitution, were subject to inequality of burdens, promotive of the interest of some to the prejudice of others; and the object of conferring this power upon Congress, was to enable the general government to etablish a uniformity of regulation between the States, which could only be done by making the power conferred absolute and exclusive, and that power protects such commodities of commerce, even after they have entered the State, from any burdens imposed by reason of their foreign origin.

Such are the leading grounds, upon which it was held, that "the Act of Missouri encroaches upon this power in this respect, and is therefore unconstitutional and void." (1 Otto, 275.)

The intention of the State not to invade the power of Congress is wholly disregarded; and the effect of the power assumed by the State in its enactment, whether operating directly or indirectly as a regulation of commerce between the States, to any certain and definite extent whatever, is regarded as the criterion by which its unconstitutionality is determined.

However vigilantly this power of Congress has been protected from invasion, it has not yet been held to the extent that laws passed by the Texas Legislature imposing an occupation tax on merchants, who are persons that buy and sell goods of every kind, foreign and domestic, are invalid, because they, in accordance with our Constitution, exempt

persons pursuing agricultural and mechanical occupations from being taxed. Such persons, so exempted from occupation tax, must buy implements and materials with which to carry on their occupations, and of course they must sell their products and manufactured articles. The home manufacturer, who sells his own articles of manufacture, (cloth, for instance, at New Braunsfels,) has an advantage over the merchant of the same place who sells similar cloth there that he bought and brought there from New York, to the extent that the cloth of that sort sold by the merchant is taxed, by his payment of the occupation tax upon his whole stock of goods, sold by him during the year, for which he pays such occupation tax.

So the miller at Dallas would have a similar advantage over the merchant of that place who sold St. Louis flour. Now, if the same rule be applied to the various products and articles manufactured in Texas, and it be held that this remote and indirect advantage, derived to the person who only sells his own products and articles of manufacture at his own place of business, is a regulation of commerce between the States, then it will follow practically that Texas cannot constitutionally levy an occupation tax upon a merchant of any kind whatever who buys and sells anything brought into this State from another, when a similar article is produced or manufactured in this State, and sold by the producer or manufacturer.

On that principle, there might be a remote and indirect regulation of commerce by the State in imposing a higher occupation tax upon one class of merchants than upon another in proportion to their purchases; as, for instance, if the occupation tax of all merchants was fixed at one hundred dollars, the goods brought into the State by a fourth-class merchant— say, ten thousand dollars' worth—would be taxed much higher than those brought in by the wholesale merchant—say, one hundred thousand dollars' worth. The advantage to the larger merchant over the smaller, in the per cent. of tax levied on the stock of each thus introduced in the State,

would be as ten is to one, and might be argued to be the same as if Congress had passed a law making such a regulation by which the burdens allowed to be imposed upon goods transported from one State to another should be made lighter in proportion to the amount each merchant might transport. So goods sold by a peddler bear a much greater burden, according to aggregate value, than those sold by a wholesale merchant, by the operation of the occupation tax imposed on each. As to the State, that is in a measure equalized by the latter paying an *ad-valorem* tax, and the former not, usually. And thus, in various ways scarcely appreciable, remote and indirect regulations of commerce might be searched out and found in the operation of tax laws enacted by the States.

It may be fairly presumed, however, that the decision cited has gone far enough in that direction to vindicate the power of Congress to regulate commerce between the States, and that Texas may levy an occupation tax upon merchants as a class, and exempt from such tax two other classes of persons within the State, following agricultural and mechanical pursuits, who, as part of such pursuits, sell their products and manufactured articles.

Now, the question under this proposition is,—What person, representing a class of persons, was intended to be designated in the proviso? The answer is, that class of persons then in this State who only sold goods manufactured by themselves, and who were exempted from an occupation tax by our State Constitution.

To declare such exemption as a guide to the officers who should execute the law, and who might not otherwise understand the exception in the Constitution, I understand to be the object and effect of the proviso.

A proviso may be used to indicate that something therein recited is not properly embraced within the preceding enactment, as well as to exclude from it something which would otherwise be embraced in it. Such, it is believed, was the case here. If the third section of the act is closely examined,

it will be seen that each occupation is treated of separately, and if not disposed of in the same sentence, it is presented in such connection as to mark plainly the separation between it and others. Coming to merchants, they were classified and taxed according to the respective amounts of their annual purchases, and then, as a class, a clear and unmistakable definition was given to identify them: "A merchant is any person or firm engaged in buying and selling goods, wares, or merchandise of any kind whatever." Buying and selling goods as a business, usually in an establishment located in one place, was what pointed them out as merchants, to be taxed according to the amount of their purchases. By such a designation, officers would have but little trouble, practically, in finding and recognizing them. There were other persons whose business it was to sell goods, wares, or merchandise; of whom was a class of persons called, commonly, traveling agents or drummers, who were not located usually in any establishment, and who, from their mode of doing business in different counties of the State to which they traveled, did not fall under the definition of merchants. Officers might ascertain that they sold goods, but not that they bought, as most usually they sold for merchants at a distance. To impose a tax on them, they were pointed out by the things done by them, which could be ascertained readily, to wit, selling goods, selling by sample, card, or otherwise, and selling goods in different counties. They were required to pay to the State fifty dollars, double that required of a wholesale merchant, and five dollars more in each county in which he sold; because, it may be inferred, he paid no *ad-valorem* tax as an established wholesale merchant would. The party coming within this description could not be classed as a merchant as defined, because, as a class, he made no amounts of purchases that could be ascertained by officers. The word otherwise, in that part of the sentence, "by sample, card, or otherwise," should be understood, as doubtless intended, to mean "by other like means"; for if it be taken

literally, it would include any and every person engaged in selling goods. It is most obvious that the part of the sentence preceding the proviso had no reference to merchants, as if it had it would have fixed their tax at a uniform rate of fifty dollars. It is equally obvious that it related to sellers, and not to buyers and sellers of goods. There was another class of persons who were sellers,—sellers of goods manufactured by themselves,—upon whom the Legislature had no right to impose an occupation tax. To prevent this class from being considered as embraced by the use of the word "otherwise," that is, selling otherwise than by sample and card, the proviso was introduced at the end of this sentence: "provided, no person, firm, or association of persons, selling exclusively goods manufactured in this State, shall be a merchant." It is to be noticed that the word "selling" is used, and not "buying and selling," as the act to indicate the person, and also the word "goods," and not also "merchandise," to indicate the thing sold. If it had been said, "shall not be taxed," instead of "shall not be considered a merchant," its meaning and application would have been free of all difficulty. To account for this, we must look back into the acts of the Legislature imposing taxes. It will be found, that from 1837 to the present date, the occupations have been enumerated and designated from time to time as they have been introduced into the country, commencing at first with a short list of a finger's length, and increasing until they now fill more than two pages in the pamphlet acts. Most generally these occupations would be described by names in common use, attached to the person or to the business, so that the officers of the law could know who to call on for the tax imposed.

The traveling agent or drummer made his appearance in the acts of the Legislature with no recognized name, but designated by the acts performed by him, as follows: "From every person selling goods by sample, card, or otherwise, one hundred and fifty dollars." (Act of 1870; Paschal's Dig.,

art. 7649.) There was no tax levied on merchants by name, and, unless this provision embraced them, there was no occupation tax levied on them, but they rendered their taxes by an *ad-valorem* assessment, as they had for some time done by an income and *ad-valorem* tax. (Paschal's Dig., art. 7563.)

In 1871, an act was passed enlarging the list of occupation taxes, including merchants, prepared evidently in reference to clearing up the obscurity and uncertainty of the act of 1870. After classifying and taxing merchants very similarly to the act of 1873, that has been previously referred to, it proceeded as follows: "A merchant is any person or firm engaged in buying or selling goods, wares, or merchandise of any kind whatsoever. Every person or firm selling goods by sample, card, or otherwise shall also be considered a merchant; provided, that the county tax for selling goods by sample, card, or otherwise shall be collected only in one county; that no person or firm selling exclusively goods manufactured in this State shall be so considered." (Paschal's Dig., art. 7659, p. 1607.)

Here the traveling agent or drummer was indicated by the necessary inference that he sold in more counties than one; that he sold goods by sample, card, or otherwise, as was indicated in the act of 1870. He could well be included under the head of a merchant as expressed, because he sold goods, and the definition of a merchant was any person or firm engaged in buying or selling. Here, too, as in the act of 1873, the word "otherwise" must be understood "by like means," to prevent the equalizing of the occupation tax of all classes of merchants. There was a deficiency in this statute, that most probably rendered this enactment useless as to this class, by omitting to assign them to any class, unless it was by the expression that "all retail merchants not of the first, second, or third class shall be considered of the fourth class," which last class were taxed ten dollars, and the classes were all fixed by the amount of purchases. Then comes in the proviso, in connection with this class of persons who

only sold goods, and provided that another class of persons who sold exclusively goods manufactured in this State should not be so considered; that is, should not be considered merchants, so as to be liable to a tax. When the act of 1873 was drawn up, evidently in view of that of 1871, and the definition of a merchant was changed from engaging in buying or selling to engaging in buying and selling, it excluded all of the classes of persons who were only sellers of goods, including those who sold by sample, card, or otherwise; and it thereby became necessary, after disposing of merchants, to add another and separate clause, to make the proper disposition of the classes of persons who only sold goods, and it was done by imposing a tax of fifty dollars upon one class of sellers, and exempting the other by the proviso, by the awkward expression that they shall not be considered merchants,—induced, as may be supposed, by the confusion engendered in following and in the effort to correct the phraseology of the former act. In the previous act, he had been declared, in effect, not to be a merchant, to prevent him from being taxed, and the same was done in this act, for the same purpose, and that now became the more important, as he was still associated in the same clause with persons who were taxed, who, like himself, only sold goods. In the act of 1875, now in force, this provision is fortunately omitted entirely, the first part of it being useless as not enforcible, and the proviso as unnecessary. (Gen. Laws 1875, p. 243.)

Now, it may be asked,—Why should it be held that this proviso must relate to and affect the provisions of the act in relation to merchants, when in both acts, of 1871 and 1873, it is found distinctly separated from them, and immediately connected with a class of persons who only "sell goods by sample, card, or otherwise"? If such had been the design of the Legislature, in the framing of the act of 1873, wherein it was evidently intended to obviate the uncertainty of that of 1871, by greater accuracy and perspicuity of expression, with greater system in arranging the different heads of occu-

pation tax, relating to different classes of persons known to be then selling goods, in different ways and of different sorts, how easy it would have been to have introduced the proviso separately, as an independent provision, or in connection with the definition of a merchant, with expressions to clearly indicate an intention to exempt from occupation taxes those persons who bought and sold goods, wares, and merchandise as other merchants, but who confined their business to buying and selling such as were manufactured in this State? That they did not so intend, may be arrived at not only from a construction of the act in connection with other previous acts, but from other potent considerations of a more extraneous character, when we endeavor to look at the law as applied to the state of things as they existed at the time of its passage. It is the business of this or any other court called upon for action, to understand, as far as practicable, the meaning of words, and of terms, and modes of expression used in statutes, and to know to what persons, or classes of persons, or things, as they existed at the time of the passage of the law, were intended to be designated or represented by them; or, in other words, to read, understand, and apply a statute law in the light of the facts—the notorious condition of things, the public history of the country, the occupations and pursuits of the people, and generally to what subjects said occupations and pursuits relate—as they exist in the country at the time of the passage of the law, and to which it is intended to apply, by the words, terms, or descriptions used in the law to designate the objects sought to be regulated by the statute.

When we find a person or class of persons mentioned in a law as following a particular occupation, described by name or by mode of operation, and taxed, it is fair to presume that an occupation is then in existence, within the State, answering to the description or name given in the law imposing the tax. There was a time in this State when the list of occupation taxes did not embrace any tax on insurance companies, as it does now; and that was because there were then here

no such companies to be taxed; and so with other objects of taxation. On the other hand, we have no reason to presume that the Legislature has taxed an occupation before it exists here, in anticipation of its being introduced at some future time. The Legislature has not in anticipation levied an occupation tax on persons following the business of making paper, of lithographing, of making wires or ropes, and many other things that may be occupations followed in this State within the next ensuing five, ten, twenty, or fifty years.

The act of 1873 defines and taxes merchants, and designates five different classes, because they were known to follow the occupations indicated by each class. It describes and taxes a class of persons that, for brevity, I have styled traveling agents or drummers, because they then did the business described within this State. It describes another class of persons as being persons selling exclusively goods manufactured in this State. We have a right to presume that there was such a class of persons. It was proved, on the trial in this case, that there was such a class of persons, and that they were manufacturers, and sold the articles which they manufactured. They meet the description in the law, by being one of two classes of persons who only sell goods and are not merchants. If they bought and sold goods "of any kind," whether manufactured in the State or not, they would come under the express definition of merchants; and this class designed to be designated are, in terms of the law, not to be considered merchants.

In the face of all this, shall we presume that a class of persons existed here who were engaged in buying and selling exclusively goods manufactured? Upon what foundation will it be done? It was not proved, if it existed, as it could easily have been in the city of Galveston, the principal commercial city of the State. The appellee was certainly interested in making such proof, to prevent the designation of the persons, as it was contained in the statute, from being applied to the class of persons that was proved to exist, who only sold their

manufactured goods. A wholesale merchant buying and selling exclusively goods manufactured in the State of Texas, or such a merchant of any grade, is not known to have as yet made his appearance in any of our judicial proceedings; and, if we may exercise our knowledge of the common history and notorious condition of things in the State, he is not likely to appear in the next fifty years. The proposition itself, as submitted to us, may be said to impliedly admit that there are such persons. If so, it is hypothetical, and not in the case as presented in the record, and should not influence our construction of the law, in application to the merits of the real question presented by it.

If the matter was evenly balanced between the classes, and both were shown to have existed, we should presume that the law referred to the class which would certainly preserve its validity, rather than to that which would defeat it.

There is another most cogent reason, as it is believed, why this proviso should be construed as having been intended to express that the class of persons referred to did not come within the enacting clause or clauses relating to merchants, rather than that it was designed to withdraw a class of persons from its operation that otherwise would be included. That is, that if there had been a class of persons who bought and sold exclusively goods manufactured in this State, the benefit conferred upon them by the operation of the law, if fully carried out, would be so trivial and insignificant as to rebut the presumption of its having been intended. A wholesale merchant would derive a benefit on $100 of $3\frac{3}{4}$ cents, and of $37.50 on his $100,000; and no more if his purchases amounted to a million of dollars. That is certainly not the degree in which governments afford protection to home manufactures, in this age, when they undertake it.

There is still another reason why the Legislature did not intend to designate merchants buying and selling goods by the exemption contained in this proviso. They must have been aware of the facts, which are notorious, that there are

but a few small manufactories of any sort in this State; and, from the population, extent of country, the absence of large capital, and the known habits of the people in their industrial pursuits in this State, there is not likely to be any great increase of them for many years to come. They, therefore, could not have been providing a benefit for a merchant who would be expected to set up business, either wholesale or retail, with a few sorts of cloths, some castings, jugware, plows, wagons, shoes, and the like, and confine himself alone to Texas manufactures, with and for the inducement of the protection of $3\frac{3}{4}$ cents on the $100 upon the capital or credit of his purchases. That would simply be to make the Legislature to have been dealing in a ridiculous Utopia.

Indeed, as an original question, if the act had been so worded as to have forced the construction that a class of merchants who bought and sold goods exclusively manufactured in Texas was excluded from the operation of the act requiring of others the payment of such an occupation tax, it might, as it is believed, well have been held, that its indirect and unintended effect, in the regulation of the commerce between the States, was too minutely finitesimal in its diminutiveness to have been judicially appreciable.

Practically, there would be but little danger of a State ever levying on occupation tax so high as to furnish an amount of protection that would materially interfere substantially with the power of Congress in regulating commerce between the States; and if it should be done, it would be so enormous in amount as to shock the dullest sense of propriety, and exhibit upon the act itself a plain intention to regulate commerce, that would call for a ready correction by the courts. For instance, to afford any substantial protection, to an extent that would be any inducement to any person to engage as a merchant in buying and selling goods exclusively manufactured in this State,—say, five per cent. upon his minimum purchases of $100,000,—the annual occupation tax would have to be raised to the sum of $5,000, and, to secure that per cent. of

protection on larger amounts, there would have to be classes, and the class whose purchases amounted to $1,000,000 would have to pay an annual occupation tax of $50,000.

The difficulty, however, of finding any definite line of division between the power of Congress and State authority, founded upon any fixed principle, is fully appreciated; and in deference to the decisions of the Supreme Court of the United States, the final arbiter of such questions, none has been attempted, beyond following strictly the rules laid down by that court on this subject, to the extent that they are understood to have gone.

Again, if it were necessary, in order to preserve the validity of this part of the law levying on occupation tax upon merchants, it might be plausibly held that the proviso, being separated from a direct connection with the clauses relating to merchants, and placed in direct connection with, and by its position apparently a qualification to, a class of persons who are not merchants under the definition as given in the law, should not be construed to apply to and to affect the provisions relating to merchants, if it were even doubtful to what class it is intended to apply; and if, upon that doubt, it be applied to the class of traveling agents with which it is in direct connection, then it certainly does not apply to merchants, and would only operate as a restriction upon commerce to the extent of a burden upon the goods sold by persons selling by sample, card, or otherwise—as heretofore "otherwise" has been explained. Or the proviso, being clearly separable from the clause relating to merchants, may be rejected as inoperative, because it would give to the tax law relating to merchants the effect of being a regulation of commerce, and therefore contrary to the Constitution of the United States.

Though the members of this court may not all agree to all of the grounds and reasoning of this opinion, they each, for some of the grounds herein presented, do agree, and hold, that the occupation tax imposed upon wholesale merchants

by the act of 1873 is valid, and not in conflict with the Constitution of the United States.

The next proposition which will be considered, being the fourth one agreed to as involved in the case, reads as follows, to wit: "Can suit for the recovery of money paid be maintained by appellee against appellant, on the ground of the unconstitutionality of the law under which the tax was collected, without showing that the payment was made under protest or under compulsion?"

The County Court (the appellant) that received the money from the collector of county taxes, collected it from appellant and others as an occupation tax.

The County Court, though embraced in the "judicial department of the government," is made by the Constitution and laws a political agency, to manage the local affairs of the government within the limits and in the modes prescribed by the laws applicable to their power and duties. (Const. 1876, art. 5, sec. 18; Const. 1869, art. 5, sec. 20; Paschal's Dig., p. 1118.) A part of its powers and duties is to levy taxes, and disburse the money collected in discharge of the expenses, debts, and obligations of the county, in accordance with the laws prescribed for their direction and government. In reference to the levy of taxes by it, as it is styled, it might be more accurate, in reference to its powers, to say that it declares and fixes, by an order entered on its minutes, the amount of the taxes, not exceeding the maximum allowed to be collected for the use of the county, as prescribed by the acts of the Legislature in levying the taxes for both State and county purposes. The discretion it has in this, is to determine the amount, within the limits of the levy made by the Legislature for the use of the county, according to their knowledge and judgment of the expenses and indebtedness of the county to be met and discharged by it.

The money so collected is not retained and accumulated, as money paid to an individual, which is an increase to his permanent wealth; but, when collected, it is paid out as soon

as practicable, that being the object of the collection; and the County Court is thereby made, for and under the authority of the State, a mere instrumentality, from year to year, to do that public business for the county, and not for the private benefit or on the private account and responsibility of the persons who compose that court. The tax in this case was levied by the Legislature, and the amount fixed by the County Court to be collected for the county was within the allowed limit, being $12.50—one-half of the State occupation tax levied upon wholesale merchants, $25. (Gen. Laws, secs. 3, 4; Act of 1873, p. 203.) This was a tax reasonable in itself, being, indeed, very low, considering that a wholesale merchant is one whose annual purchases must amount to $100,000, and imposed and collected alike, so far as is shown, from all such merchants in the county, and, we may presume, in the whole State; and there is in the amount, or mode of collection, or the object of its being levied, as prescribed by law, nothing from which it could possibly be regarded as an act of oppression or injustice upon the citizen, by the government or its officers.

There was no protest against paying this tax when it was collected, and no compulsion to pay it, unless the legal authority of the officer collecting the same to seize property upon default of its payment, as it stood in the law,—if, indeed, there was any such,—without its being attempted or threatened to be carried out, constituted in and of itself compulsion. The law referred to in the brief of appellee relates to seizures by the sheriff under the act of 1873. (Gen. Laws, sec. 29, p. 146.) The preceding section (28) requires the State occupation tax to be paid to the sheriff, and the county occupation tax to be paid to the county treasurer; but the section (29) that authorizes the sheriff to seize property, and no other section of that act, authorizes the county treasurer to seize property upon default of payment of the county tax. But the act of 1875 (Gen. Laws 1875, sec. 1, passed March 13, 1875) made the default an indictable offense, in which

the fine should not be more than double the tax; and that law went into force on the 13th of May, 1875, which was before the payments were made for which this judgment was rendered.

So that, if it should be conceded that the law referred to, or any other law, authorized a seizure by any officer for the county tax, it was certainly not shown that it was attempted or threatened; nor was there shown to have been any threat or attempt to prosecute the parties who paid these taxes, in order to enforce their payment. The proposition now under consideration, as presented to us, pretermits any protest or compulsion in making the payment.

It was not shown that the money paid by these merchants was on hand, in possession of the county treasurer, or otherwise under the control of the County Court.

The suit not having been brought for nearly two years after the money was paid by them in the regular course of business, it would have been paid out to meet the expenses of the county, if the officers did their duty in levying only the necessary amount, and paid it out in a reasonable time after it was collected, which should be presumed in their favor, unless it had been alleged and proved otherwise, or at least a contrary presumption raised by evidence, which was not done in this case. The money then, we may conclude, had been appropriated to the benefit of the county.

If this judgment stands, the money can be refunded only by another tax, levied and collected, sufficient to pay the principal paid, with interest thereon, together with the cost of suit, as it has been adjudged against the county.

It is not shown that there was any unwillingness to pay the taxes when they were collected, or that the officer collecting or the County Court had any notice of any objection to the payment of the money, or reception and disposition of it by the County Court, until this suit was brought, nearly two years after its payment. It is not shown that the parties, when they paid the money, or the collecting officer or the

County Court, when it was received, knew, or even suspected, that the law under which it was collected was illegal. The law imposing the tax was one which the Legislature had an undoubted right to pass, and the alleged illegality consisted in connecting with it an exemption, as contended by appellee, which made it illegal by its being thereby a regulation of commerce.

This explanation is made, to clear the case from any and every extraneous and influencing circumstance, so as to bring clearly to view the object of this suit, and the principle announced in this proposition which is sought to be established by it, which is: That if an ordinary tax is imposed by the Legislature, and in the regular course of business paid by the person taxed, without any question having been made as to its illegality, or as to the impropriety of its mode of collection, or any other objection when it is paid, and that part of it which is collected for the county has been paid to the county treasurer, to be disposed of by the County Court to defray the expenses and pay the debts of the county, have those who thus paid the tax, afterwards, at any time within two years, the right to bring a suit against the county and recover it back, simply on the ground that the tax was illegal,—not illegal for the want of authority in the Legislature to impose such a tax as that which was paid, but illegal because there was incidentally connected with such tax, in the same law, a provision which made the levy of the tax, in connection with that provision, indirectly a regulation of commerce, and thereby violative of the Constitution of the United States? We are of opinion that they have not, because in such case it is voluntarily paid, and it, under the circumstances, is not contrary to good conscience for the county to retain it. It was voluntary, because it was without objection paid under a mistake of law, if it was illegal, and there was no mistake of fact in paying it, and no deceit, fraud, or compulsion used in collecting it, or in causing it to be paid, on the part of the county or of any of its officers, that prevented

the will of the parties paying it from being freely exercised in doing the act. It is not contrary to good conscience to retain it, because the county and its officers were at no fault, and guilty of no turpitude in receiving and disposing of it under color of a law which was regarded and acted on by all parties concerned as valid at the time it was paid, received, and disposed of; and its being recovered back would work an injury to the county by the cost of the suit, the payment of interest, the expense of litigation, and the additional expense of collecting and paying out these amounts, with the consequent derangement of its fiscal affairs, in pursuance to the judgment of the court requiring it to be done, which would result in one party sustaining a damage, annoyance, and trouble, when both parties were equally innocent, and both equally at fault, in that which caused it. The principles which underlie the rules of law here announced, have been long and well established by numerous decisions in the courts of England and of this country.

Subject, of course, to variation by qualifying circumstances, it may be said, generally, that "he is willing, who either expressly consents or tacitly makes no opposition"; and, also, "he who consents to a thing, or makes no opposition to it, cannot complain of it as an injury," which is the ancient maxim, *Volenti non fit injuria.* (Burrell's L. D., p. 1049; Broom's Maxims, 127; Brisbane *v.* Dacres, 5 Taunt., 162.)

When money is paid under a mutual mistake of law, the mistake of law, in and of itself, is no ground for recovering it back. All persons are equally presumed to know the law, and in such case both parties are equally at fault, and equally innocent of wrong done. To admit ignorance of law to be legally recognized as a fact sufficient in itself to pervert the will of the parties doing the act, so that it should be said and held that the will did not concur with the act done, thereby relieving him from the responsibility for and the consequences of the act, would render the administration of the law impracticable; and hence the rule is founded upon a political neces-

sity, as well as upon public policy. (Bilbie v. Lumley, 2 East, 468; Brisbane v. Dacres, 468 (see Mansfield's and Gibbs' opinions); Elliott v. Swartwout, 10 Pet., 153 (see opinion of Thompson, J.); Clarke v. Dutcher, 9 Cowen, 674; Forbes v. Appleton, 5 Cush., 115; 2 Cow., 419; 2 Black, 824; 12 East, 38; 13 Gray, 476; 10 Allen, 48; 15 Mo., 563; 27 Me., 146; 2 Rich., (S. C.,) 317.)

This rule and the maxim quoted are expressly laid down, or impliedly taken for granted, as starting-points in the investigation of most of the cases, whether, upon the other facts, the money paid has been recovered back or not.

A mistake of fact on the part of one who pays, and deceit or fraud and compulsion on the part of one who receives, under which money is paid, are each and all legally recognized as facts sufficient in and of themselves to pervert the will of the party doing the act, so that it should be said and held, that the will did not concur with the act done, thereby relieving him from the responsibility for and the consequences of the act. These are such facts as it is practicable to judicially investigate, and there is no great public policy in forestalling their investigation, when they exist in a degree well defined, and practically capable of exerting a controlling influence upon the acts of the party who has paid the money, as it may then be said, against his will, or at least in the absence of its free exercise.

There may be found a difference of decision in determining what constitutes a mistake of fact, deceit or fraud, or compulsion amounting even to a conflict of opinion, particularly in those cases involving the collection of taxes, and other acts of officers done under color of office, or in excess of their authority; but as the proposition before us presupposes that there was no protest or compulsion, it may suffice to refer to some of the cases, without exhibiting the distinctions made in them. (Morgan v. Palmer, 9 Eng. Com. Law R., 232; Ripley v. Gelston, 9 Johns., 201; Irving v. Wilson, 4 T. R., 485; Astley v. Reynolds, 2 Strange, 915; Snowden v. Davis, 1

Taunt., 350; First National Bank v. Watkins, 21 Mich., 483; Joyner v. Egremont, 3 Cush., 567; Preston v. City of Boston, 12 Pick., 7; Boston & S. G. Co. v. Boston, 4 Met., 181; Elliott v. Swartwout, 10 Pet., 156.) In these cases, it will be found that the obtaining payment of money illegally for a license, to get possession of property to avoid a threatened seizure of goods, are payments under compulsion.

A demand, with power to seize, is sometimes held to be compulsion. (12 Pick., 7; 17 Mass., 461; 4 Met., 189.) Otherwise, where there is no process issued, or the party has adequate remedy to resist at law. (Taylor v. Board of Health, 31 Penn., 73; Barrett v. Cambridge, 10 Allen, 48; Union Bank v. Mayor of New York, 51 Barb., 159; Knibbs v. Hall, 1 Esp., 84; Forbes v. Appleton, 5 Cush., 117.)

These influencing facts being established, raise a sufficient presumption of compulsion, whether the unwillingness is expressed or not at the time of payment, as shown by many of the authorities cited. And without the existence of immediate compulsion, the unwillingness to pay an illegal tax or demand—or, in other words, the absence of the will concurring with the act of payment—may be manifested by a payment under protest, or notice of intended suit to recover it back; and that would rebut the presumption of its being voluntary, which might arise in such a case from the silence of the party paying it. (Elliott v. Swartwout, 10 Pet., 153; Borough of Allenton v. Saeger, 20 Penn., 421.)

This mode of exposition has been adopted, to explain that the object and purpose of showing that a payment of money was made under protest or under duress, in any such case, was to rebut any presumption of its having been paid voluntarily; and that when it was admitted, in the proposition, that the payment was made without any protest or compulsion, the presumption must be indulged that it was voluntary; and that therefore the authorities mainly relied on by appellee in his brief and argument, being cases where money was recovered back on the ground of compulsion, have no application to the

proposition (fourth in number) submitted for our determination. (See First National Bank v. Watkins, 21 Mich., 483 ; Joyner v. Egremont, 3 Cush., 567 ; City of Marshall v. Snediker, 25 Tex., 471.)

As to the case last cited from 25 Texas, this may require some explanation. That was a suit brought by two grocers against the corporation of Marshall, to recover back the sum of five hundred dollars, paid by them as an occupation tax for selling spirituous liquors in quantities less than a quart, for one year, being the year in which they brought the suit, which was imposed upon and collected by the said corporation, it being double the amount of the State tax. The petition alleged that said tax was out of proportion to the taxes imposed upon other occupations, stating the same ; that it was exacted and forced out of them in violation of the Constitution and laws ; and that petitioners paid the same under compulsion.

"A jury was waived, and the cause submitted to the decision of the court upon the agreement that the facts stated in the petition are true, and the following facts, to wit: They had a license from the county of Harrison for the year, for which they had paid two hundred and fifty dollars ; that their investments did not exceed two thousand dollars, and profits not more than one thousand dollars. They paid to the corporation an *ad-valorem* tax, in amount the same as the State tax. An ordinance of the corporation affixed a fine of twenty-five dollars per day for every day they might retail without having paid the tax." By the city charter and by the law, (O. & W. Dig., art. 1987,) their property was subject to seizure and sale in a summary manner by the assessor for the collection of the tax.

It was decided that the tax was illegal, as being disproportioned to the State tax, and that the corporation exceeded its legal authority in levying it at so high a rate.

On the other point, as to right of recovery, while the doctrine of voluntary payment was fully recognized, it was held

that the parties were not on equal terms, and that the excessive, unjust, and illegal tax, with its power of summary enforcement, and the heavy penalty upon default under which the demand was made before the license to retail would be issued, made it against good conscience for the corporation to retain it; and that, therefore, the plaintiffs were entitled to recover it back.

It is evident that the grounds of the decision were not fully brought out in the opinion; for it was admitted, by admitting the facts in the petition, that they were forced to pay the tax, and did pay it under compulsion. If all of the admitted facts in that case are fully considered,—the perversion and excess of authority used by the corporation to accomplish indirectly an object foreign to the legitimate collection of revenue; the enormous and unusual penalty for default of payment imposed, and to be enforced by the corporation itself, large enough in forty days to sweep away the whole of their little capital, if they resisted its payment; the summary remedy hanging over them, and the two hundred and fifty dollars having already been advanced for a county license,—all backed, as may be presumed, by a public sentiment that could tolerate the levy and collection of such an extravagantly illegal tax, which must have been well known to them, placed them under a moral pressure which may be regarded as of equal influence, in perverting the free will, as though they had been threatened with an immediate seizure of their property; and it was doubtless upon that view, though not fully developed in the opinion, that the court determined the payment to have been made under compulsion, as it was stated that it was in the petition, and admitted to be true.

Now, whether the court was correct or not in determining that the facts in that case were sufficient to establish the compulsion, it was upon the opinion that they did establish it, that it was held not to have been a voluntary payment, and that plaintiffs were entitled to recover it back; and doubtless, too, the perversion and excess of authority in the corporation

had its influence in the determination that it was against good conscience for the corporation to retain it. (Snowden *v.* Davis, 1 Taunt., 358; Morgan *v.* Palmer, 2 Barn. & Cress., 729.)

The case of Baker *v.* Panola County was one in which the payment was made under protest, and is therefore not applicable. (30 Tex., 86.)

The decision in the case of Galveston *v.* Sydnor, in which the taxes were recovered back, was based upon the authority of the two preceding cases, and most probably upon a want of a full appreciation of what was intended to be decided by them, and therefore cannot be maintained as a controlling precedent. (39 Tex., 241.)

The remaining point is, that it is not unconscionable for the county to retain the money voluntarily paid to, received, and disbursed by its officers for its benefit.

This is not on the principle of the refusal of the court to permit a recovery of a premium paid and retained on a gaming policy of insurance, in which both parties being violators of the law, neither would be helped. (Lowry *v.* Bourdieu, 2 Doug., 470, and notes.) Nor is it like the rule in equity in case of a usurious loan, where "a man who, from mere necessity, pays more [interest] than the other can in justice demand, and who has been significantly called the slave of the lender. He can in no just sense be said to pay voluntarily." (1 Story's Eq. Jur., sec. 302.) But in this case the right to retain it does not arise out of or rest upon any legal right of the county to have received the money, but upon the absence of any fault on its part in its being received and retained, and the want of right on the part of the plaintiff to change the existing state of things, produced by his voluntary act, at expense, trouble, and annoyance of the county, and the consequent derangement of its fiscal affairs.

In the case of Brisbane *v.* Dacres, Mansfield, C. J., enforces this principle, in a broad, liberal manner, well addressed to practical common sense, in relation to gratuitous payments

made by a captain to an admiral, in the British navy. (5 Taunt., 160–1.) A like view, more nearly in point in its facts, is taken by the Supreme Court of Pennsylvania, in a case where an amount of taxes, in part illegal, had been paid without objection by protest or by notice of suit for reclamation, which taxes had been assessed by a town council; in which case it is said: "It is unlike a payment to an individual. It is contribution to a common fund, in the benefits of which he, as a citizen or property holder, participates. It is intended for immediate expenditure for the common good, and it would be unjust to require its repayment, after it has been thus, in whole or in part, properly expended, which would often be the case, if suit could be brought for its recovery without notice having been given at the time of payment; and there would be no bar against its insidious spring but the statute of limitations." (Borough of Allentown *v.* Saeger, 20 Penn., 421.) Those remarks apply, with force, pertinently to this case ; and to them may be added the further observations, that the tax paid is no hardship, being, indeed, a mere trifle, compared to the capital of the merchant who paid it. It is one that the Legislature has a right to impose, and has uniformly been imposed, except during a short period, for more than thirty years, in obedience to the plan of raising a public revenue to defray the expenses of the State and counties, as prescribed in the Constitutions of the State, and its alleged illegality consists in an alleged incidental connection with an exemption which is claimed to give to it the effect of being indirectly a regulation of commerce between the States, and consequently an intrenchment upon the exclusive powers of the Congress of the United States. And even admitting it to be so, and that there were some merchants who bought and sold goods exclusively manufactured in Texas, (which was not, and, as is notorious, could not be proved,) the consequent disadvantage to other merchants would practically be, like the amount of the tax itself,

a matter of no sort of importance in affecting his business as a merchant. And, further, if a suit of this kind can be maintained against the county by every person who has voluntarily paid his taxes in the ordinary course of business, upon unexpectedly discovering some incidental defect in the tax law at any time within two years, the county is liable to be in constant litigation with its own inhabitants, accompanied by the necessary expense of litigation, at every change of the tax laws, of which there have not been less than twenty within the last forty years.

If there had been a protest upon payment of the taxes being made, or notice given that suit would be brought to recover the money back, and suit had been promptly brought, before it was disbursed and while it was still in the hands of some of the officers, as it certainly should be done, especially in the case of the collection of taxes, unless their collection was enjoined, then not only would the fact of its being a voluntary payment be rebutted, but the expense, trouble, and annoyance in the derangement of the fiscal affairs of the county would be greatly obviated.

Other authorities may be referred to, tending to establish that the county may in good conscience retain the money voluntarily paid as taxes without protest or compulsion. (Taylor *v.* Board of Health, 31 Penn., 74; Farmer *v.* Arundel, 2 Black., 825; Bize *v.* Dickason, 1 T. R., 285; Walker *v.* City of St. Louis, 15 Mo., 574; Tyler *et al. v.* Smith, 18 B. Monr., 793.)

The growing importance of the questions involved in this case, and their relation to the public interest and to the administration of the government of the State, have induced a more extended investigation of both of the propositions that have been discussed, than might otherwise have been necessary.

We are of opinion that the tax was not violative of the Constitution of the United States, and that if it had been so

held, this action could not be maintained, under the facts of this case and the law applicable thereto.

Judgment reversed and cause remanded.

REVERSED AND REMANDED.

SEPARATE OPINION OF ASSOCIATE JUSTICE GOULD.—I concur in the judgment rendered, and in the positions assumed in the opinion, except the construction that the proviso does not apply to merchants. In addition, also, to the positions taken in the opinion, I hold that though the proviso applied both to merchants and to those who sold by sample, the law is divisible, so that the proviso may, if necessary, be rejected, and the tax, without the exemption, remain in force.