WOOD MOTOR COMPANY, INCORPORATED, ET AL V.
C. W. NEBEL, JR., ET AL.

No. A-2915. Decided April 4, 1951.
(238 S. W., 2d Series, 181.)

*George H. Prendergast,* of Marshall, *Graves, Dougherty and Greenhill* and *Joe R. Greenhill,* of Austin, for petitioner.

The Court of Civil Appeals erred in holding that damages were recoverable for breach of contract after its termination by the Direct Dealer pursuant to express provisions of the contract. Gable v. Frigidaire Corporation, 121 S.W. 2d 456; St. Louis S.W. Ry. Co. v. Griffin, 106 Texas, 477, 171 S.W. 703; Decker v. Kirlicks, 110 Texas 90, 216 S.W. 385.

*Gist, Wilson & Prothro,* of Tyler, and *Joseph P. Witherspoon,* of Austin, for respondents.

The Court of Civil Appeals correctly held that, the failure of Wood Motor Company to sell and deliver new cars to Nebel company sufficient to satisfy the requirements of the latter's retail trade was a breach of the contract between the parties for which damages were recoverable. Cox v. Humble Oil and Refin-

ing Company, 16 S.W. 2d 285; Ellis v. Dodge Bros., 246 Fed. 764; Chicago, R.I. & G. Ry. Co. v. Martin, 163 S.W. 613, writ refused.

MR. CHIEF JUSTICE HICKMAN delivered the opinion of the Court.

This is a suit by C. W. Nebel and son, C. W. Nebel, Jr., doing business as Nebel Motor Company, styled "Associate Dealer," against Wood Motor Company, styled "Direct Dealer," for damages for the alleged breach of a contract entered into between the parties of date June 30, 1944. The trial court rendered judgment in favor of respondents against petitioner for $25,000.00, and the case was affirmed by the Court of Civil Appeals. 232 S. W. 2d 772.

The contract consisted of two instruments, both prepared by Chrysler Corporation, one being labeled "De Soto and Plymouth Motor Vehicles Associate Dealer Agreement," and the other "Terms of Purchase." The war was in progress when the contract was made and on that account no cars were then in production. It was expected that when peace was restored rapid sales at good profits would follow, and the contract was made in the light of that expectation. Prior to the resumption of production and the receipt of new cars by petitioner in January, 1946, the respondent expended large sums of money in remodeling a building in Longview, equipping a service department, an office and book-keeping department, purchasing display signs, and running advertisements in newspapers, all for the purpose of being prepared to engage in the business of selling and servicing De Soto and Plymouth cars when production was resumed. During the year 1946 petitioner received from the factory 77 De Soto and 190 Plymouth cars, of which number it retained 36 De Soto and 75 Plymouth cars for sale in the Marshall area, and delivered to respondents but one car of each make. The remainder were distributed among other "Associate Dealers." For some reason petitioner became dissatisfied in January, 1946, with its arrangement with respondents and undertook to procure a termination of the contract by mutual consent, failing in which it mailed this notice to respondents on July 5, 1946:

"Re: Associate Dealer Agreement, No. 481.

"Pursuant with paragraph nine, Termination by Notice, of the above captioned agreement, you are hereby notified that this agreement will be terminated on October 5, 1946, unless it is your desire to make this termination effective at an earlier date by mutual written consent."

Upon the trial of the case in the district court the jury found in answer to special issues: (1) that petitioner breached its contract with respondents prior to July 5, 1946, by its failure to deliver to respondents their proportionate share of available new automobiles; (2) by reason of which respondent sustained damages in the sum of $6,000.00 prior to July 5, 1946; (3) that petitioner waited an unreasonable length of time from and after January 19, 1946, to give respondent written notice of the termination of the contract; (4) that petitioner had no just cause for terminating the contract as of July 5, 1946; (5) that since the termination of the contract respondents had sustained damages in the sum of $19,000.00; and (6) in anwser to a special issue requested by petitioner it found that respondents did not breach the contract prior to January 19, 1946. Upon the verdict, judgment was rendered in favor of respondents for $25,000.00. It should be observed here that the case was submitted to the jury on the theory that July 5th and not October 5th was the date of the termination, if any, of the contract, and no question with respect thereto is presented here.

We consider first the item of $6,000.00 damages which, according to the finding of the jury, accrued prior to July 5, 1946, the date of the notice of termination.

Section 4 of the Terms of Purchase Agreement provides:

"ACCEPTANCE OF ORDERS

"Direct Dealer shall have the right to accept, in whole or in part, any or all orders received, and shall not be liable for any loss or damage resulting from its failure to ship or deliver goods ordered."

Section 4 of the Associate Dealer Agreement provides in part:

"Orders for Motor Vehicles. In order to facilitate the orderly scheduling of production and shipments from week to week, Associate Dealer agrees to submit weekly his orders for new motor vehicles * * *. A dealer is expected to accept any motor vehicle ordered by him. * * *."

Section 22 of the Associate Dealer Agreement provides:

"Force Majeure. Neither Direct Dealer nor Associate Dealer will be liable for failure to perform its part of this agreement when the failure is due to fire, flood, strikes or other industrial

disturbances, inevitable accident, war, riot, insurrection or other causes beyond the control of the parties."

■ Since respondents never actually placed any orders with petitioner, the argument is pressed here that no damages are recoverable for petitioner's failure to deliver cars. Obviously, the point reaches the entire judgment, and while petitioner does not claim in its argument that no contractual relations ever existed between the parties, the effect of sustaining the point would be to hold that none ever existed. It is elementary that if a contract is susceptible of two constructions, one of which would render it valid and the other void, the former will be adopted. We have concluded that Section 4 of the Terms of Purchase Agreement, when considered in the light of the contract as a whole, is reasonably susceptible of the construction that the nonliability provision thereof does not extend to cars for which orders were accepted by the petitioner, but is applicable only to cars, orders for which were not accepted by it. The provision deals with acceptance of orders, and the nonliability clause is a part of the sentence dealing with the right to accept orders. The "right to accept" imposes the duty to perform when that right is exercised, subject to the provisions of the Force Majeure section.

■ While there is no evidence that respondents ever filed or that petitioner ever accepted any orders, there is evidence which in our opinion raised the issue of the equivalent of orders and acceptances. The jury has found that petitioner breached its contract with respondents by its failure to deliver to respondents their proportionate share of new automobiles. Mr. Wood of Wood Motor Company testified, in effect, that his company was advised by the factory not to take orders for cars because of the uncertainty of deliveries; that there was no sense in taking orders when cars were not available; that Chrysler Corporation advised him against taking orders, and he in turn made the same recommendation to his dealers. He further testified: "I expected a fair and equitable distribution of my part of the automobiles, and I, in turn, expected to make a fair and equitable distribution." He further testified that but for the fact that in January, 1946, petitioner decided not to send respondents any more cars, respondents would have received about the same number of cars as those sent to the Associate Dealer in Kilgore. That is, to our minds, some evidence that petitioner, in effect, treated the transaction as amounting to an acceptance by it of the obligation to deliver to respondents their proportionate share of cars without the necessity of written orders. The other As-

sociate Dealers, twelve in number, did not turn in orders, but petitioner delivered to them their proportionate shares, respectively, based upon a formula adopted for the purpose of determining the proper ratio. We are unable to hold, as a matter of law, that the strictness of the written contract in the respect under consideration was not modified as to all Associate Dealers alike. Accordingly, that portion of the judgment of the trial court, affirmed by the Court of Civil Appeals, awarding damages which accrued prior to notice of termination is affirmed.

The similarity between the provisions under review and the provisions in Ford Motor Co. v. Maddox Motor Co., 123 Texas 608, 73 S. W. 2d 517, is apparent, but we have concluded that the cases may be distinguished on the ground that in the Ford-Maddox case the plain provision was against liability for failure to fulfill estimates "under any circumstances," while in this case the provision is reasonably susceptible of the more liberal construction above indicated.

We turn now to a consideration of the item of $19,000.00 awarded respondents as damages which accrued after the contract was terminated by notice, if in fact it was terminated. The jury found that petitioner had no "just cause" for terminating the contract and that respondents sustained damages in the sum of $19,000.00 between the date of termination and the date of trial. Judgment was rendered on the verdict and was affirmed by the Court of Civil Appeals. Section 8 of the Associate Dealer Agreement reads as follows:

"REASONS FOR TERMINATION OTHER THAN BY NOTICE
"While it is the desire of DIRECT DEALER to establish lasting arrangements with ASSOCIATE DEALER, it is recognized that certain conditions may arise in which it is impracticable for this agreement to continue in effect. In the interest of friendly relations between ASSOCIATE DEALER and DIRECT DEALER, it is important that the circumstances be set forth so that they may be thoroughly understood by both parties to this agreement. Accordingly it is agreed that this agreement shall terminate immediately by its own force without notice from either party in the event of (1) an attempted assignment of this agreement by ASSOCIATE DEALER without DIRECT DEALER'S written consent; (2) an assignment by ASSOCIATE DEALER for the benefit of creditors; (3) the admitted insolvency of ASSOCIATE DEALER: (4) the institution of voluntary or involuntary proceedings by or against ASSOCIATE DEALER in bankruptcy or under insolvency laws or for corporate reorganization, or for receivership or for the dissolution of ASSOCIATE DEALER; (5) the admitted insolveyancy of any member of ASSOCIATE DEALER if a partnership; or

(6) the discontinuance of ASSOCIATE DEALER'S representation in his sales area of the products herein referred to. Termination under this paragraph shall not impose any liability upon DIRECT DEALER under the provisions of Paragraph 9. It is further agreed by ASSOCIATE DEALER that he will immediately advise DIRECT DEALER in writing of the occurrence of any event specified in this paragraph."

Section 9 of the same agreement reads in part as follows:

"TERMINATION BY NOTICE

"IT IS also recognized that certain other conditions may arise under which either party may desire to terminate this agreement by giving reasonable notice to the other party. Accordingly it is agreed that this agreement may be terminated at any time upon not less than ninety (90) or more than ninety-five (95) days' written notice by DIRECT DEALER or upon not less than fifteen (15) or more than twenty (20) days' written notice by ASSOCIATE DEALER."

Further provisions of that section are to the general effect that upon the termination of the agreement under that provision petitioner was obligated to buy all cars and parts purchased by respondents from it and all signs of a type recommended by petitioner.

It is the position of respondents that "Section 9 of the contract, properly construed, permitted termination by the petitioner only upon the existence of a just cause, including (1) a breach of contract by respondents, or (2) impossibility of performance of the contract by petitioner." The courts below adopted that view. By so doing, it is our view that they fell into error.

■ We can discover no ambiguity whatever in the language above quoted. In section 8 it was provided that the contract should terminate immediately by its own force without notice under six specified conditions. Under the first and sixth of those conditions the respondents could terminate the contract at their will. Had respondents desired to put an end to the contract, all that was required of them was an attempt on their part to assign it without petitioner's written consent, or to discontinue representation of De Soto and Plymouth products. Under Section 9 provision is made for the termination by giving notice. That section provides a method whereby petitioner as well as respondents might terminate the contract. The advantage accruing to respondents by terminating the contract under Sec-

tion 9 rather than Section 8 is that by terminating it under Section 9, petitioner was obligated to purchase the cars and parts which respondents had on hand that were purchased from petitioner. Respondents take the position that "Section 9 of the contract between petitioner and respondents states that 'certain other conditions' may arise which will give the right to terminate by adverse written notice." We cannot read that provision into the contract. What the contract says is that "certain other conditions" may create a desire on the part of either party to terminate the contract. If that desire is created, then the right to terminate by giving the prescribed notice is unqualified. Section 9 does not provide that the agreement may be terminated by notice if conditions warrant it or if a just cause for termination exists. It simply provides that it may be terminated by notice if either party so desires. There being no ambiguity in the language of the contract, resort to rules of construction is not permissible. Many authorities are cited in the briefs, but we think it quite sufficient to cite the following: Maddox Motor Co. v. Ford Co. (Com. App.), 23 S. W. 2d 333; Goodwin Bros. v. Cook, 307 Ky. 646, 212 S. W. 2d 126; Cadillac La Salle Company of Palm Beach v. Claude Nolan, 118 Fla 250, 158 So. 883; Martin v. Ford Motor Co., 93 Fed. Supl. 920.

Under respondents' theory they could terminate the contract at any time with or without notice, while petitioner could not terminate it even with notice, unless a jury or judge should hold that a good cause existed therefor. Under our view, to support that theory would be to make a contract for the parties and deny to them the valuable right to contract for themselves. Long ago Sir George Jessel wrote:

"* * * if there is one thing which more than another public policy requires it is that men of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts when entered into freely and voluntarily shall be held sacred and shall be enforced by Courts of justice. Therefore, you have this paramount public policy to consider—that you are not lightly to interfere with this freedom of contract." Printing and Numerical Registering Company v. Sampson, 19 L. R., Equity, 462, 465.

■ In St. Louis Southwestern Railway Company v. Griffin, 106 Texas 477, 171 S. W. 703, L. R. A. 1917 B, 1108, this court held unconstitutional a statute which required corporations to give a "true cause" certificate to discharge employees. In the course of that opinion it was written, "The citizen has the liberty of

94

contract as a natural right which is beyond the power of the government to take from him." The latest decision by this court reaffirming and applying this principle is Bennett v. Copeland, 149 Texas 475, 235 S. W. 2d 605. It is not claimed that this contract was procured by fraud or that it was against public policy. In this situation our duty is plain.

It is therefore ordered that the judgments of the courts below in so far as they awarded to respondents judgment against petitioner for $6,000.00 damages suffered prior to termination be affirmed, and that in so far as they awarded judgment for $19,000.00 for damages accrued after termination, they be reversed, and judgment here rendered that respondents take nothing. Affirmed in part and reversed and rendered in part.

Opinion delivered April 4, 1951.

No rehearing applied for.