**BMG DIRECT MARKETING, INC., Petitioner,**

v.

**Patrick PEAKE, Individually and as Representative of Others Similarly Situated, Respondent.**

No. 03–0547.

Supreme Court of Texas.

Argued Feb. 18, 2004.

Decided Nov. 18, 2005.

---

**71.** 159 Tex. 227, 318 S.W.2d 619, 622 (1958).

Lynne Liberato, Patricia L. Casey, Alene Ross Levy, Mark Ryan Trachtenberg, Haynes and Boone, L.L.P., Houston, Steven M. Hayes, and Gregory A. Clarick, Parcher Hayes & Snyder, P.C., New York, NY, for Petitioner.

Christopher A. Kesler, and Bruce B. Kemp, Kemp & Kesler, L.L.P., Houston, Timothy W. Ferguson, Ferguson Firm, Beaumont, for Respondent.

Justice O'NEILL delivered the opinion of the Court, in which Chief Justice JEFFERSON, Justice HECHT, Justice BRISTER, Justice MEDINA, Justice GREEN, Justice JOHNSON, and Justice WILLETT joined.

In this class-action case, the trial court certified a class of music club members who paid allegedly illegal late fees for failing to timely pay for compact discs in accordance with the terms of a membership agreement. The parties dispute whether the customers' claims are subject to the voluntary-payment rule, which has sometimes been successfully invoked to bar restitution of money that has been voluntarily paid with full knowledge of all the facts and without fraud, deception, duress, or coercion. Although the voluntary-payment rule's application has been largely supplanted by the creation of legal and statutory remedies, we conclude that the rule applies to the customers' claims for restitution of late fees in this case. Because the trial court failed to analyze the

rule's effect on the requirements for class certification and how the claims in this case would be tried, we decertify the class and remand the case to the trial court for proceedings consistent with this opinion.

## I. Background

BMG Direct Marketing operates music clubs that sell compact discs to club members, principally through direct mail and online services. Membership in a BMG club begins with one of a variety of special promotions, typically "11 CDs for the price of one" or "12 CDs for the price of one." BMG assesses a late fee of $1.50 if club members do not pay for the compact discs within thirty days. All BMG promotions include a statement that late fees will apply to past-due BMG invoices. Each customer's initial shipment of compact discs includes a Membership Guide which provides: "Payment is due when you receive your shipment. Late charges will be added to your account for amounts unpaid after 30 days." In addition, each BMG shipment, including the initial one, contains an invoice which specifies: "If payment is not made within 30 days, a late charge of $1.50 will be added to your account (not a finance charge)."[1] Customers are given ten days to decline membership for any reason and may return the compact discs at BMG's expense with no further obligation.

Named plaintiff Patrick Peake was a BMG club member who bought dozens of compact discs from the company from 1999 to 2002. During this period he incurred and paid to BMG late fees totaling $7.35. In 2002, Peake sued BMG to recover the late fees he had paid, claiming they constituted an illegal penalty because the fee charged did not reasonably forecast BMG's actual damages resulting from customers' late payments.

Peake moved to certify a class consisting of all present and former BMG club members in Texas who had paid BMG late fees since May 16, 1998. BMG opposed the motion, arguing that the voluntary-payment rule applied to each potential class member's claims and precluded a finding that common issues would predominate. The trial court certified the class, noting that it was "unlikely" the voluntary-payment rule would apply in this case because the rule is equitable and "need not be applied where the rationale for its existence does not exist." The trial court further held that, even if the voluntary-payment rule did apply, the "issue is not individual and may be determined as another common issue on a class wide basis." A divided court of appeals affirmed without deciding whether or not the rule applied, holding that in either event the class members' lack of full knowledge based upon BMG's failure to disclose all material facts in the agreement would be a question common to the entire class. 175 S.W.3d 267, 269. We granted BMG's petition to consider the voluntary-payment rule's application to this case.

## II. Liquidated Damages

■ Peake claims that BMG's late fees constitute an unlawful penalty. In Texas, we distinguish a permissible liquidated damages clause from an unenforceable penalty. *Phillips v. Phillips*, 820 S.W.2d 785, 788 (Tex.1991). For such a clause to be enforceable, the fee charged must be a reasonable estimate of damages, and those damages must be incapable of precise calculation. *Id.* Companies enter into late-fee agreements with their customers because the precise damages that will result from their customers' untimely payments is generally difficult if not impossible to ascer-

---

1. The late fee used to be $0.95, but has been increased to $1.50.

tain. *See* 24 Samuel Williston & Richard A. Lord, Williston on Contracts § 65:1, at 229 (4th ed.2002) (observing that a "liquidated damages clause is designed to substitute a sum agreed upon by the parties for any actual damages suffered as a result of a breach"); *see also Phillips*, 820 S.W.2d at 788 ("[T]o be enforceable as liquidated damages the damages must be uncertain. . . ."). In this way, parties allocate the risk of uncertainty over the actual loss that will be realized if a customer's payment is not timely. By entering into these contractual arrangements, "the need for the nonbreaching party to prove actual damages" is obviated. Williston & Lord, *supra*, § 65:1, at 230 (quoting *Bair v. Axiom Design, L.L.C.*, 20 P.3d 388 (Utah 2001)). The agreed upon late fee thus quantifies a level of uncertainty—that both parties recognize—and allocates the risk of that uncertainty between the contracting parties.

The uncertainty inherent in calculating damages attributable to customers' untimely payments is aptly demonstrated in the case law through the varied testimony of battling experts.[2] Allowing parties to contractually allocate this risk of uncertainty carries out Texas's public policy strongly favoring the freedom of parties to contract. *See, e.g., In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 129 (Tex.2004)

("As a rule, parties have the right to contract as they see fit as long as their agreement does not violate the law or public policy."); *Wood Motor Co. v. Nebel*, 150 Tex. 86, 238 S.W.2d 181, 185 (1951). As we have said:

> [I]f there is one thing which more than another public policy requires it is that men of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts when entered into freely and voluntarily shall be held sacred and shall be enforced by Courts of justice. Therefore, you have this paramount public policy to consider—that you are not lightly to interfere with this freedom of contract.

*Wood Motor Co.*, 238 S.W.2d at 185 (quoting *Printing & Numerical Registering Co. v. Sampson*, 19 L.R.Eq. 462, 465 (1875)).

▄ Although parties may contractually allocate the risk of uncertainty over the amount of damages that will be incurred in the event of untimely payment, liquidated damages still must be a reasonable estimate of damages in order to be enforceable. In this case, Peake paid BMG's late fees without protest and only later asserted that they were unenforceable; under these circumstances, BMG contends, Peake's claims (and those of the class) are subject to the voluntary-payment defense.

**2.** *See Dist. Cablevision Ltd. P'ship v. Bassin*, 828 A.2d 714, 719 (D.C.2003) (noting that "[a]t trial, both sides presented extensive testimony and other evidence regarding [the cable company's] billing practices and the costs that [the company] sustained when its subscribers did not pay their bills on time"); see also *Time Warner Entm't Co. v. Whiteman*, 741 N.E.2d 1265, 1268–69 (Ind.Ct.App.2001), *aff'd in part, vacated in part*, 802 N.E.2d 886 (Ind.2004) (detailing evidence of a cable company's ten-month study to determine the amount of damage caused by delinquent customer payments and the expert opinion of a rate-setting consultant explaining why that study was flawed); *United Cable Television of* *Baltimore Ltd. P'ship v. Burch*, 354 Md. 658, 732 A.2d 887, 891 (1999) ("To a considerable degree the case was a battle of experts over quantifying the costs incurred by [the cable company] when an account was not paid in full by the due date under the [cable company]—subscriber contract, and over which of those costs properly were to be included in computing a late charge. For example, after this action was instituted, [the cable company] retained an accounting firm, Deloitte & Touche, to calculate the monthly cost of delinquencies per delinquent customer, and the author of that study concluded that the cost was $16.14. The Plaintiffs' expert opined that that cost was thirty-eight cents.").

Before addressing this argument, we examine the voluntary-payment doctrine's underpinnings and its development in our jurisprudence.

### III. History of the Voluntary–Payment Rule

More than fifty years ago, we stated the common-law voluntary-payment rule as follows: " '[M]oney voluntarily paid on a claim of right, with full knowledge of all the facts, in the absence of fraud, deception, duress, or compulsion, cannot be recovered back merely because the party at the time of payment was ignorant of or mistook the law as to his liability.' " *Pennell v. United Ins. Co.*, 150 Tex. 541, 243 S.W.2d 572, 576 (1951) (quoting 40 Am.Jur. § 205 (1942)). The rule is a defense to claims asserting unjust enrichment; that is, when a plaintiff sues for restitution claiming a payment constitutes unjust enrichment, a defendant may respond with the voluntary-payment rule as a defense. *See Randazzo v. Harris Bank Palatine, N.A.*, 262 F.3d 663, 670 (7th Cir.2001) (noting that exceptions to the voluntary-payment rule are designed "to foster the restitutionary principles that have long stood in tension with the voluntary payment rule"); Restatement (Third) of Restitution & Unjust Enrichment § 6 cmt. e (Tentative Draft No. 1, 2001) ("The restitution claim to recover a payment in excess of an underlying liability . . . meets an important limitation in the so-called voluntary-payment rule."); *see, e.g., Brown v. Oaklawn Bank*, 718 S.W.2d 678, 681 (Tex.1986) (affirming restitution and rejecting voluntary-payment defense as payee had not detrimentally relied on payment).

This Court recognized the rule as early as 1880 in *Ladd v. Southern Cotton Press and Manufacturing Co.*, 53 Tex. 172 (1880). In that case, Ladd, a cotton buyer, sued to recover money he paid to Southern Cotton Press, claiming that the payments were made involuntarily, under duress, and without consideration. *Ladd*, 53 Tex. at 173–74. Ladd alleged duress arising from the defendant's unlawful combination with others to charge an amount greater than the services rendered were reasonably worth or that, in some instances, were not even performed. We rejected Ladd's assertion of duress, noting that the defendant's business was "open to all who wished to engage in it" and that "any one engaging in it may prescribe the terms upon which he will transact it. All parties employing his services, knowing his terms, would be bound by them." *Id.* at 193. We concluded that the voluntary-payment rule applied to bar Ladd's claims, stating:

> As it appears from the petition that the payments were made with full knowledge of all the facts and without fraud or deception, unless made under duress, the amount thus paid cannot be recovered back, although so much as exceeds the reasonable value of the services rendered was paid without consideration.

*Id.* at 192. There being no evidence of duress, we held that "[a]ppellant certainly had ample time and opportunity to have had his day in court, before the business between him and appellee was closed by the last voluntary payment made by him. Not having complained until the late date at which this suit was brought, he cannot now be heard to complain." *Id.* at 194.

When the voluntary-payment rule is applied between private parties, as in *Ladd*, the underlying public policy has been described as follows:

> [A] party who pays a claim is deemed to have made his own decision that it is justly due. If he thinks otherwise, he should resist. He should not pay out his money, leading the other party to act as though the matter were closed, and then be in a position to change his mind and

invoke the aid of the courts to get it back.

*R.G. McClung Cotton Co. v. Cotton Concentration Co.,* 479 S.W.2d 733, 743 (Tex. Civ.App.-Dallas 1972, writ ref'd n.r.e.). We have acknowledged that public policy favors protecting the finality of payments when a person is aware of all the facts upon which the liability to make payment depends, and there is no fraud, deception, duress, or coercion involved. Because of these policy concerns, this Court and Texas courts of appeals have, at times, applied the voluntary-payment rule between private parties. *See Pennell,* 243 S.W.2d at 575–76 (disallowing an insurance company recovery of payments made under a mistake of law because "money voluntarily paid on a claim of right, with full knowledge of all the facts, in the absence of fraud, duress, or compulsion, cannot be recovered back merely because the party at the time of payment was ignorant of or mistook the law as to his liability"); *Gilliam v. Alford,* 69 Tex. 267, 6 S.W. 757, 759 (1887) (disallowing recovery of a "voluntary settlement" when "the money was paid under a mistake of law; for it is well settled that money paid under a mistake of law with respect to liability to make payment, but with full knowledge of all the facts on which the claim for payment is based, and on which the right to resist it depends, cannot be recovered"); *Ladd,* 53 Tex. at 192–94; *see also Southwest Indus. Import & Export, Inc. v. Borneo Sumatra Trading Co.,* 666 S.W.2d 625 (Tex.App.-Houston [1st Dist.] 1984, writ ref'd n.r.e.) (discussing the rule in the context of sale of goods); *R.G. McClung Cotton Co.,* 479 S.W.2d at 743–44 (discussing the rule in the context of sale of goods, but allowing recovery because payor never intended to surrender his claim for damages for breach of contract); *Runcie v. Runcie,* 407 S.W.2d 861 (Tex.Civ.App.-Amarillo 1966, writ ref'd n.r.e.) (discussing the rule in the context of payment of bank note); *Am. Cas. & Life Ins. Co. v. Boyd,* 394 S.W.2d 685 (Tex.Civ.App.-Tyler 1965, no writ) (discussing the rule in context of payment of insurance premiums); *but see TCI Cablevision of Dallas, Inc. v. Owens,* 8 S.W.3d 837 (Tex.App.-Beaumont 2000, pet. dism'd by agr.) (discussing the voluntary payment rule in the context of cable late fees but concluding "it is far from clear that the voluntary payment doctrine applies here").

■ The voluntary-payment rule has also been applied, albeit infrequently, to prohibit recovery of illegal taxes paid to the sovereign. This Court has stated: "A person who voluntarily pays an illegal tax has no claim for its repayment" unless that person paid under duress. *Austin Nat'l Bank v. Sheppard,* 123 Tex. 272, 71 S.W.2d 242, 245–46 (1934). In *City of Houston v. Feizer,* 76 Tex. 365, 13 S.W. 266, 267–68 (1890), we refused recovery to a butcher who had paid taxes to the city that the city was not authorized to collect. There, we observed that the rule against recovery of voluntary payments "precludes the courts being occupied in undoing the arrangements of parties which they have voluntarily made, and into which they have not been drawn by fraud or accident, or by any excusable ignorance of their legal rights and liabilities." *Id.* at 267; *see also Nat'l Biscuit Co. v. State,* 134 Tex. 293, 135 S.W.2d 687, 693–94 (1940) (allowing recovery of permit fees and franchise taxes paid to the state under laws which were later declared unconstitutional because money was paid under duress); *Sheppard,* 71 S.W.2d at 246 (allowing recovery of taxes paid when an asphalt company paid under implied duress); *Galveston Gas Co. v. County of Galveston,* 54 Tex. 287, 292 (1881) (allowing recovery when "the taxes having been paid under protest to prevent the sale and consequent cloud on title, the payment was so far compulsory as to allow

of a recovery back, if sought with reasonable promptness"); *County of Galveston v. Gorham,* 49 Tex. 279, 302, 308 (1878) (holding that it was "not unconscionable" for the county to retain funds paid to it when the payment was made voluntarily "because it was without objection paid under a mistake of law ... and there was no mistake of fact in paying it, and no deceit, fraud, or compulsion used in collecting it, or in causing it to be paid"). In the taxation context, the voluntary-payment rule is intended to "prevent the taxing entity from using funds paid by taxpayers in a given budget year and subsequently being required to refund these amounts." *City of Laredo v. S. Tex. Nat'l Bank,* 775 S.W.2d 729, 731 (Tex.App.-San Antonio 1989, writ denied); *see also Salvaggio v. Houston Indep. Sch. Dist.,* 752 S.W.2d 189, 193 (Tex.App.-Houston [14th Dist.] 1988, writ denied) ("The policy behind the rule is to discourage litigation and to secure the taxing authority in the orderly conduct of its affairs.").

 Although the voluntary-payment rule has been applied, at times, in both the private and public contexts, other legal and statutory remedies have evolved over time to supplant the rule's application in many of these contexts.[3] Like other equitable claims and defenses, an adequate legal remedy may render equitable claims of unjust enrichment and equitable defenses of voluntary-payment unavailable. *See, e.g., Fortune Prod. Co. v. Conoco, Inc.,* 52 S.W.3d 671, 684 (Tex.2000) (holding unjust enrichment inapplicable when parties have express contract covering the subject mat-

ter of the parties' dispute); *Bexar Bldg. & Loan Ass'n v. Robinson,* 78 Tex. 163, 14 S.W. 227, 228 (1890) (holding usury statute prevented voluntary-payment defense). For example, the Texas Tax Code now provides that a person may recover a voluntary payment of certain illegal taxes, as long as the person paid under protest. Tex. Tax Code § 112.051(a) ("If a person who is required to pay a tax or fee imposed by this title or collected by the comptroller under any law ... contends that the tax or fee is unlawful ... the person shall pay the amount claimed by the state, and if the person intends to bring suit under this subchapter, the person must submit with the payment a protest."); *see also McKesson Corp. v. Div. of Alcoholic Beverages & Tobacco,* 496 U.S. 18, 22, 110 S.Ct. 2238, 110 L.Ed.2d 17 (1990) ("[I]f a State penalizes taxpayers for failure to remit their taxes in timely fashion, thus requiring them to pay first and obtain review of the tax's validity later in a refund action, the Due Process Clause requires the State to afford taxpayers a meaningful opportunity to secure postpayment relief for taxes already paid pursuant to a tax scheme ultimately found unconstitutional."). Likewise, the voluntary-payment rule is no longer outcome determinative when deciding whether a judgment voluntarily paid moots an appeal. Now, the payment of a judgment without an "expressed intent" to continue an appeal moots the appeal, but payment with such an expression does not. *See Miga v. Jensen,* 96 S.W.3d 207, 212 (Tex.2002); *see also Riner v. Briargrove Park Prop. Own-*

---

**3.** Many other states, however, still recognize and apply the voluntary-payment rule. *See Hassen v. Mediaone of Greater Fla., Inc.,* 751 So.2d 1289, 1290 (Fla.Dist.Ct.App.2000); *Telescripps Cable Co. v. Welsh,* 542 S.E.2d 640, 642 (Ga.App.2000); *Smith v. Prime Cable of Chicago,* 276 Ill.App.3d 843, 213 Ill.Dec. 304, 658 N.E.2d 1325, 1329–30 (1995); *Time War-*

*ner Entm't Co. v. Whiteman,* 802 N.E.2d 886, 891–92 (Ind.2004); *Horne v. Time Warner Operations, Inc.,* 119 F.Supp.2d624, 628 (S.D.Miss.1999); *McWethy v. Telecomms., Inc.,* 988 P.2d 356, 358 (Okla.Civ.App.1999); *Putnam v. Time Warner Cable of Southeastern Wis., Ltd. P'ship,* 255 Wis.2d 447, 649 N.W.2d 626, 632 (2002).

*ers, Inc.,* 858 S.W.2d 370, 370–71 (Tex. 1993); *Cont'l Cas. Co. v. Huizar,* 740 S.W.2d 429, 430 (Tex.1987) (holding that an appeal was properly dismissed as moot where appellant paid the judgment without duress); *Highland Church of Christ v. Powell,* 640 S.W.2d 235, 236–37 (Tex.1982) (holding that payment of judgment did not moot appeal when paid under duress); *Employees Fin. Co. v. Lathram,* 369 S.W.2d 927, 929 (Tex.1963); *Cravens v. Wilson,* 48 Tex. 321, 323–24 (Tex.1877). Furthermore, whether an insurer's voluntary payment of a claim can be recovered or reimbursed is considered a matter of contract,[4] and whether a bank may recover voluntary payments mistakenly made to depositors is now governed by chapter 4 of the Uniform Commercial Code.[5]

Thus, although the voluntary-payment rule may have been widely used by parties and some Texas courts at one time, its scope has diminished as the rule's equitable policy concerns have been addressed through statutory or other legal remedies. Indeed, this Court has affirmatively applied the rule only once in the last forty years, and that holding has itself been modified since. *See Huizar,* 740 S.W.2d at 430 (holding voluntary payment of judgment without duress, although under protest, mooted appeal); *cf. Miga,* 96 S.W.3d at 212 (holding payment of judgment will not moot appeal if accompanied by clear expression of intent to prosecute appeal). Nevertheless, we have never abrogated the voluntary-payment rule, and it still has limited application in Texas jurisprudence.

## IV. The Voluntary–Payment Rule's Application in this Case

■ As already noted, the trial court and court of appeals rejected BMG's assertion that the voluntary-payment defense precluded certification on three grounds: (1) it was "unlikely" the defense would apply, (2) the rationale for it did not exist in this case, and (3) if it did apply, it could be decided on a class-wide basis. 175 S.W.3d at 268. As to the first two grounds, there is nothing in the record or Texas law to indicate that the voluntary-payment rule should not generally apply to a customer's claim for restitution of a contractually agreed-upon late fee alleged to be an unenforceable illegal penalty, nor have other remedies supplanted the rule's application in that context. As to the latter point, the trial court did not analyze the potential difficulties in applying the rule on a class-wide basis and we are unable to assess the issue on the record before us.

### A. The Rule in Other Jurisdictions

Neither the voluntary-payment rule nor the type of class litigation involved here is unique to Texas. Citing its own decision in *TCI Cablevision,* 8 S.W.3d at 845, the court of appeals found a "split of authority" that made it "far from clear" whether the voluntary-payment rule would apply. 175 S.W.3d at 268. But the split of authority is mostly one-sided; indeed, the court of appeals stands almost alone. With one exception, courts in every other jurisdiction have applied the voluntary-payment rule to claims that a late fee like the one here is an illegal penalty. *See Hill*

---

**4.** *See Tex. Ass'n of Counties v. Matagorda County,* 52 S.W.3d 128, 133–35 (Tex.2000) (rejecting equitable right to reimbursement).

**5.** *See* Tex. Bus. & Com.Code title 1, ch. 4. *See also* Tex. Bus. & Com.Code § 1.308 ("A party that with explicit reservation of rights performs or promises performance or assents to performance in a manner demanded or offered by the other party does not thereby prejudice the rights reserved. Such words as 'without prejudice,' 'under protest,' or the like are sufficient.").

*v. Galaxy Telecom,* 2000 U.S. Dist. LEXIS 2404 at *6 (N.D.Miss.2000); *Horne,* 119 F.Supp.2d at 630; *Putnam,* 649 N.W.2d at 631–33; *Dillon v. U–A Columbia Cablevision,* 292 A.D.2d 25, 740 N.Y.S.2d 396, 398 (N.Y.App.Div.2002); *Telescripps Cable Co.,* 542 S.E.2d at 643; *Hassen.,* 751 So.2d at 1290; *McWethy,* 988 P.2d at 358; *see also Smith v. Prime Cable of Chicago,* 213 Ill. Dec. 304, 658 N.E.2d at 1330, 1332–34 (holding voluntary payment barred class action alleging pay-per-view show lasted two hours rather than three as advertised).

On the other side, one court has held that the voluntary-payment rule did not apply because late fees were not paid voluntarily when customers faced the "duress" of losing their cable television service. *Whiteman,* 802 N.E.2d at 890–93. Texas law has always required more than this to constitute "duress" under the voluntary-payment rule. *See Ladd,* 53 Tex. at 193 (holding private company's refusal to do business except on its own terms "cannot be held to be duress"). While this Court has never addressed the voluntary-payment rule's application to late fees, we long ago applied the rule in a similar context. In *Hirshfield v. Fort Worth National Bank,* 83 Tex. 452, 18 S.W. 743 (1892), a notary charged the maker of a note a $3.50 "protest fee" for demanding payment on a past-due note, when in fact the note was not yet due. *Id.* at 744. Applying the voluntary-payment rule, this Court held that a fee "paid by the plaintiff voluntarily, with full knowledge of all the facts, and, at most, only under a mistake of law, cannot be recovered back." *Id.* at 746.

Contrary to the court of appeals' opinion, we do not find a substantial split of authority in Texas or across the nation generally that would categorically bar application of the voluntary-payment rule to the circumstances presented here. Thus,

the trial court erred in concluding that the rule was "unlikely" to apply in this case.

## B. The Rule's Requirements

Nor do we agree that the rationale behind the voluntary-payment rule can be categorically dismissed, as the trial court did here. The Wisconsin Supreme Court has explained that the voluntary-payment rule "allows entities that receive payment for services to rely upon these funds and to use them unfettered in future activities," and it "operates as a means to settle disputes without litigation by requiring the party contesting the payment to notify the payee of its concerns. After such notification, a payee who has acted wrongfully can react to rectify the situation." *Putnam,* 649 N.W.2d at 633. We, too, recognize the benefit of a rule that allows entities to rely on contractually agreed-upon late fees received from customers who, having failed to protest, appear to have willingly paid with full knowledge of all the facts and without fraud, deception, coercion, or duress, for "a person who receives payment from another without any protest from the payor should be allowed to rely on use of the funds without risking a subsequent demand for return of the payment." *Id.* at 635. The voluntary-payment rule also encourages discourse, rather than litigation, between customers and private enterprises that charge late fees in the course of their business.

■ Of course, for the voluntary-payment rule to apply, a person must pay "with full knowledge of all the facts." *See, e.g., Ladd,* 53 Tex. at 192; *Tyler v. Tyler,* 742 S.W.2d 740, 743 (Houston [14th Dist.] 1987, writ denied). Peake contends that to satisfy this requirement, BMG's customers must have known that the late fees were illegal and unenforceable when they paid them. Peake contends that because BMG did not disclose how the late fee was calcu-

lated, he and the other club members did not know and could not have known whether or not the fees charged were penal in nature or were a reasonable forecast of BMG's actual or estimated damages. Therefore, according to Peake, he and the other club members lacked "full knowledge of all the facts," precluding the voluntary-payment rule's application.

BMG, on the other hand, contends it fully disclosed its late-fee policy to club members. When it shipped CDs to members, BMG made them aware of the late-fee amount and the circumstances under which it would be imposed, and offered them the opportunity to return the items with no further obligation. According to BMG, this gave its customers "full knowledge of all the facts" sufficient to trigger the voluntary-payment rule's application.

■ We agree with BMG that knowledge of a late fee's amount and the circumstances under which it will be imposed is sufficient to charge one with "full knowledge of the facts" for purposes of the voluntary-payment rule's application. *Accord Dillon v. U–A Columbia Cablevision of Westchester, Inc.,* 100 N.Y.2d 525, 760 N.Y.S.2d 726, 790 N.E.2d 1155, 1156 (2003); *Putnam,* 649 N.W.2d at 634. To hold otherwise would pose substantial practical problems. As the Wisconsin Supreme Court observed, accepting the argument that the voluntary-payment rule's "full knowledge" requirement means a company has to disclose to customers precisely how its late fee was calculated "would tacitly suggest that all demands for payment in business transactions would need to be accompanied by an itemized list explaining the basis for each charge, so that the payor had full knowledge of the facts as required by the voluntary payment doctrine." *Putnam,* 649 N.W.2d at 634. Even then, the payor could presumably challenge the basis asserted, with the

result that the "full knowledge" requirement could never be met. It would be impractical and unfair to parties entering into late-fee agreements to interpret the "full knowledge" requirement in the way Peake proposes. We therefore decline to adopt an interpretation of the voluntary-payment rule that would eviscerate its purpose and create such an enormous burden on those who charge legitimate late fees in the regular course of their business.

■ We note that at least one court has held that customers who pay late fees with knowledge of the fee's amount and the circumstances under which it will be charged, do so under a mistake of law rather than a mistake of fact. *Putnam,* 649 N.W.2d at 633. And it is well settled in Texas that payment made under a mistake of law is not an exception to the voluntary-payment rule. *See Pennell,* 243 S.W.2d at 575–76 (voluntary payment cannot be recovered "merely because the [payor] . . . was ignorant of or mistook the law as to his liability"); *Gilliam,* 6 S.W. at 759 ("Money paid under a mistake of law . . . cannot be recovered."); *Putnam,* 649 N.W.2d at 635 (observing that a mistake of law "does not represent the type of wrongful action that should be excepted from the voluntary payment doctrine"); *but see City of Taylor v. Hodges,* 143 Tex. 441, 186 S.W.2d 61, 63 (1945) (refusing to apply the rule that "relief cannot be had from a payment made under a mistake of law" to situations in which "the payment is made with public money"). Thus, if Peake or any other club members paid BMG's late fees under a mistake of law, *i.e.,* believing that the fees were a reasonable estimation of damages and not an illegal penalty, they may still be charged with full knowledge of the facts for purposes of the voluntary-payment rule.

■ We recognize that the Indiana Supreme Court has taken a different ap-

proach to applying the voluntary-payment rule, one that it acknowledges is contrary to the great weight of authority. *See Whiteman*, 802 N.E.2d at 891.[6] That court relied largely on the Tentative Draft of the Restatement (Third) of Restitution & Unjust Enrichment, which defines a voluntary payment as one "paid in the face of a recognized uncertainty as to the existence or extent of the payor's obligation to the recipient." Restatement (Third) of Restitution & Unjust Enrichment § 6 cmt. e (Tentative Draft No. 1, 2001). We agree with the Draft Restatement's articulation of the full-knowledge requirement as contemplated by the voluntary-payment rule: "When properly employed, a reference to 'voluntary payment' is judicial shorthand for a truth of common experience: that a person must often choose to act on the basis of imperfect knowledge, accepting the risk that further information (acquired with the benefit of hindsight) may reveal the choice to have been less than optimal." *Id.* As we have said, late-fee arrangements like the one BMG and Peake contracted for are designed to allocate the risk of *a recognized uncertainty* that arises from the parties' imperfect knowledge regarding the precise amount of damages that will result if payments are not timely. Thus, when a person pays a late fee knowing its amount and the circumstances under which it would be imposed, that person pays in the face of a recognized uncertainty sufficient to satisfy the voluntary-payment rule's full-knowledge requirement.

### C. Challenges to the Rule's Application

Peake launches several challenges to the voluntary-payment rule's application in this case. First, he contends Texas courts have been more willing, and rightly so, to apply the voluntary-payment rule in order to protect the sovereign's income stream because the rule's justification in the taxation context is an appropriate extension of the sovereign-immunity principle. However, as we noted above, a different legal framework now governs the payment of most illegal taxes. *See* Tex. Tax Code §§ 112.051, .052; *McKesson*, 496 U.S. at 22, 31, 110 S.Ct. 2238. Moreover, this Court has not, in the past, limited the voluntary-payment rule only to public suits. *See Pennell*, 243 S.W.2d at 575–76; *Gilliam*, 6 S.W. at 759; *Ladd*, 53 Tex. at 192–94.[7]

■ The distinction between public and private entities should not alter the voluntary-payment rule's application. The Wisconsin Supreme Court has observed that

there are differences between funds received by a governmental body through taxation and revenue received by a private entity from business transactions. However, for purposes of applying the voluntary payment doctrine, the principles are similar. Both the public and private sectors should be able to rely on these resources. The voluntary payment doctrine provides stability and certainty once funds have been transferred without notice of dispute, thereby decreasing

6. Interestingly, the Indiana court seemed to suggest that if the only customer before the court had been the one who agreed to pay a specific amount in the event her payment was late, as opposed to the customer whose contract did not set forth an explicit amount, the result might have been different. *Whiteman*, 802 N.E.2d at 888 n. 3.

7. We disagree with Peake's contention that our analysis of the voluntary-payment rule in *Ladd* was limited to the public or quasi-public context. In that case, we held that the defendant's business "*was not* ... affected with a public interest," *Ladd*, 53 Tex. at 194, and we applied the rule between private parties—a cotton buyer and a cotton company. *Id.* at 193.

the transaction costs that would accrue if payments received long ago could be demanded back.

*Putnam,* 649 N.W.2d at 636–37 (footnotes omitted). We agree that both public and private entities suffer similar hardships when forced to refund agreed-upon late fees received without protest, relied upon, and used in the ordinary course of business, and reject Peake's contention that the voluntary-payment rule applies only in suits to recover money paid to the sovereign.

Peake also claims this is a "run-of-the-mill" breach-of-contract case to which the voluntary-payment rule should not apply. It is true that, to the extent the subject matter of Peake's claims is covered by the parties' contract, the rule would not apply. But insofar as Peake alleges an illegal penalty has been assessed, which would operate to void the contractual late-fee payment obligation, his refund suit sounds in restitution for unjust enrichment.

Peake argues that if it is determined he had full knowledge of all the facts, companies like BMG will be allowed to charge illegal fees to their customers without consequence. The plaintiffs in *Putnam* made a similar argument; they asked the Wisconsin court to create an additional exception to the voluntary-payment doctrine, one in which the doctrine would not apply when a private entity engaged in wrongful conduct or charged illegal liquidated damages. *Putnam,* 649 N.W.2d at 634. The Wisconsin court declined, however, to create a new exception to the rule, noting that the state's current exceptions sufficiently reinforced the public policy and equitable concerns behind the rule. *Id.* The court observed: "A claim of unlawful liquidated damages is not sufficiently similar to claims of fraud or duress, or mistake of material fact, to join them as exceptions to the voluntary payment doctrine." *Id.* at

635. According to the court, "[a]llegations of fraud, duress, and mistake each work to negate the true voluntariness of payments," whereas the "wrongdoing of unlawful liquidated damages may be technical in nature." *Id.*

 We agree with *Putnam;* a claim that a late fee constitutes an unlawful penalty is not tantamount to a claim of fraud, duress, or coercion. In this case, the late fees were a set amount per month, and there is no allegation of mistake or fraud as to their calculation. Even the Draft Restatement that the Indiana Supreme Court followed recognizes that, in circumstances like these, contracts between parties should be enforced:

A transfer pursuant to a valid agreement of the parties cannot be nonconsensual, nor can it result in the unjustified enrichment of the recipient. The basis of a claim under this section to recover a payment of money not due disappears if the payment in question was made pursuant to a valid agreement of the parties allocating between them the risk of a perceived uncertainty as to the underlying obligation. If the party making payment has assumed the risk that relevant facts are other than supposed, the payment does not become involuntary because a divergence between expectation and realization is later detected.

Restatement (Third) of Restitution & Unjust Enrichment § 6 cmt. d (Tentative Draft No. 1, 2001) (citation omitted). Liquidated damages in the form of late fees generally fit well within this paradigm because the costs resulting from untimely payments, while presumably relatively small, are real and are difficult, if not impossible, to calculate precisely. And as we have said, parties regularly use late-fee agreements to allocate the risk of uncertainty regarding the damages a company

will incur due to late customer payments. That the quantified uncertainty might later prove to be an inaccurate or unreasonable approximation of damages actually caused by customers' late payments does not make the charge fraudulent or coercive for purposes of precluding the voluntary-payment rule's application.

Nor does an unlawful-penalty allegation implicate duress under the circumstances presented here. The class does not suggest they have no alternative means of obtaining compact discs or could not choose to contract with other companies if they thought the late fees BMG charged were unreasonable or unenforceable; in fact, in this case Peake testified that he belonged to a competitor compact disc club that did not charge him late fees.[8] Thus, we see no fraud, duress, or coercion in requiring parties who contract for late fees to speak up at the time of or prior to payment and attempt to resolve any dispute before resorting to the courts at some later time.

 Certainly, the traditional fraud, duress, deception, and coercion exceptions to the voluntary-payment rule still apply in circumstances to which the rule itself does, and whether or not a consumer had full knowledge of all the facts in any given case will depend upon the specific circumstances presented. Additional exceptions would bar the rule's application

when statutory or other legal doctrines require.[9] Moreover, the voluntary-payment rule is an equitable one and may require balancing competing interests depending upon the parties' circumstances. We believe, however, that even though the rule's relevancy has receded in light of the current state of our jurisprudence, the voluntary-payment defense applies to the illegal-penalty allegation and refund request in this case. We now turn to the issue of class certification.

V. Class Certification BMG argues that application of the voluntary-payment rule to this case necessarily means individual issues will predominate and defeats class certification. BMG concedes that the "full knowledge" issue is susceptible to resolution on a class-wide basis because all purported class members relied upon the same information. According to BMG, however, resolving issues of fraud, deception, duress, and coercion, which would preclude the rule's application, will "require discovery of hundreds of thousands of current and former BMG Direct club members and would result in countless mini-trials.'" We acknowledge that this prong of the voluntary-payment rule presents the thornier issue.

 In *Southwestern Refining Co. v. Bernal,* we rejected the "certify now and

8. Further, consumers suspecting a company's late fees are unenforceable may file a complaint with the Texas Attorney General, who "protects consumers and the legitimate business community by filing civil lawsuits" under various consumer protection statutes. Consumer Protection & Public Health Information, Attorney General of Texas Greg Abbott, http://ww w.oag.state.tx.us/consumer/consumer.shtml. Consumer complaints may give rise to an investigation into a company's business practices. *Id.*

9. For example, the voluntary-payment rule would not apply to situations in which the Legislature or commonlaw has provided a right of recovery even though payment is voluntary. *See, e.g., Tex. Fin.Code* § 305.001(a) (providing that a creditor who contracts for, charges, or receives usurious interest is liable for its repayment); *Hardwick v. Austin Gallery of Oriental Rugs, Inc.,* 779 S.W.2d 438, 448 (Tex.App.-Austin, writ denied) (citing *Bexar Bldg. & Loan Ass'n,* 14 S.W. at 228 ("The common law authorizes recovery of usury even when paid voluntarily.")).

worry later" approach to class certification that many Texas courts had applied. 22 S.W.3d 425, 435 (Tex.2000). Instead, we required courts to "perform a 'rigorous analysis' before ruling on class certification to determine whether all prerequisites to certification have been met." *Id.* We further explained:

> [I]t is improper to certify a class without knowing how the claims can and will likely be tried. *See Castano v. American Tobacco Co.,* 84 F.3d 734, 744 (5th Cir.1996). A trial court's certification order must indicate how the claims will likely be tried so that conformance with Rule 42 can be meaningfully evaluated.

*Bernal,* 22 S.W.3d at 435 (citation omitted).

 The trial court certified this class action under Rule 42(b)(3),[10] which requires common questions of law or fact to predominate over individual ones and that class treatment be "superior to other available methods for the fair and efficient adjudication of the controversy." Tex.R. Civ. P. 42(b)(3). The predominance requirement's purpose is "to prevent class action litigation when the sheer complexity and diversity of the individual issues would overwhelm or confuse a jury or severely compromise a party's ability to present viable claims or defenses." *Bernal,* 22 S.W.3d at 434. When addressing predominance, the court should specifically look to " 'whether common or individual issues will be the object of most of the efforts of the litigants and the court.' "

*Id.* (quoting *Cent. Power & Light Co. v. City of San Juan,* 962 S.W.2d 602, 610 (Tex.App.-Corpus Christi 1998, pet. dism'd w.o.j.)). Importantly, courts must identify the substantive issues that will control the litigation in order to discern which issues will predominate. *Id.*

In this case, the trial court did not decide whether the voluntary-payment rule would apply, asserting only that its application was "unlikely." Even if the rule did apply, the court opined, the "issue is not individual and may be determined as another common issue on a class wide basis." The order says nothing about how the voluntary-payment rule and the issues involved in its application could be tried class wide were the court to determine that the rule did apply, nor does it consider obstacles to class certification that the rule's application might present. For example, the evidence indicates that BMG sometimes did not charge all of the late fees (once charging Peake only $2.85 for $110 worth of CDs he paid for eight months late), and that customers could return any unwanted discs. As we have said, the voluntary-payment rule is an important substantive issue that could have a significant effect on the way the claims in this case are tried. The trial court failed to "rigorous[ly] analyze" the voluntary-payment rule's effect on the requirements for class certification. *See U–Haul Co. of Ala., Inc. v. Johnson,* 893 So.2d 307, 2004 WL 1079804 (Ala.2004) (vacating a class-certification order and remanding because

---

**10.** The trial court's order certified the class pursuant to Rule 42(b)(4). Effective January 1, 2004, however, subparagraph (b)(3) was deleted from Rule 42, and former subparagraph (b)(4)—with minor changes not pertinent to our decision—is now (b)(3). *Compare* TEX. R. CIV. P. 42 and TEX. R. CIV. P. 42 General Commentary—2003 ("Subparagraph (b)(3) is omitted as unnecessary.") with TEX. R. CIV. P. 42, 553–54 S.W.2d (Tex.Cases) XXXVI–XXXVIII (1977, amended 2004). For ease of reference, we will refer to (b)(3), and those references will include former subparagraph (b)(4). As amended, Rule 42(b)'s subsections are now numbered the same as Federal Rule of Civil Procedure 23(b). *See* FED. R. CIV. P. 23(b). We note, too, that on remand the trial court proceedings will be governed by the amended rule. *Compaq Computer Corp. v. Lapray,* 135 S.W.3d 657, 661 n. 1 (Tex.2004).

"the trial court exceeded its discretion in certifying a class without addressing the question of the effect upon its certification of the U–Haul defendants' voluntary-payment defense").

We have said that a trial plan is required in every class-certification order "to allow reviewing courts to assure that *all* requirements for certification under Rule 42 have been satisfied." *State Farm v. Lopez,* 156 S.W.3d 550, 556 (Tex.2004). "The formulation of a trial plan assures that a trial court has fulfilled its obligation to rigorously analyze all certification prerequisites and 'understand[s] the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues.'" *Id.* (quoting *Bernal,* 22 S.W.3d at 435) (quoting *Castano,* 84 F.3d at 744))). Because the trial court did not examine the obstacles to class certification the voluntary-payment defense might present, the trial plan in this case lacks the analysis necessary to assure that this class meets the prerequisites for certification under Rule 42(b)(3).

We note that several courts have determined that application of the voluntary-payment rule causes individual issues to predominate and therefore precludes class certification. *See Salvaggio,* 709 S.W.2d at 308 (where taxpayers sought recovery of attorney fee charges paid in connection with penalty and interest charges for delinquent taxes, the trial court did not abuse its discretion in refusing to certify a class based on the voluntary-payment rule's application); *Smart Prof'l Photocopy Corp. v. Childers–Sims,* 850 So.2d 1245, 1251–52 (Ala.2002) (vacating a class-certification order because inquiries into whether consumers made a mistake of fact would cause individual issues to predominate); *Solomon v. Bell Atl. Corp.,* 9 A.D.3d 49, 777 N.Y.S.2d 50, 54–55 (N.Y.App.Div.

2004) (decertifying a class in part because of individual issues raised by voluntary-payment defense); *but see Sutton Steel & Supply, Inc. v. BellSouth Mobility, Inc.,* 875 So.2d 1062, 1070 (La.Ct.App.2004) (holding that class decertification was not necessary because the voluntary-payment rule is an affirmative defense and although "affirmative defenses may limit or bar a class member's ultimate recovery, they will not affect the initial determination of [the defendant's] liability"). As decisions from these courts indicate, the voluntary-payment rule may well involve some individualized inquiry. But we decline to hold that a class can never be certified when a defendant has asserted the voluntary-payment defense; in many cases it would be unfair to allow a defendant to preclude class certification simply by alleging an affirmative defense.

The parties in this case, both here and in the class-certification proceeding, have directed their focus on whether the voluntary-payment doctrine's full-knowledge requirement has been met, and we have determined that it has. Moreover, we have said that the class members' unlawful-penalty allegation, under the circumstances presented here, does not implicate the type of fraud, duress, or coercion that would preclude the voluntary-payment defense. We cannot tell from the record, though, whether the plaintiffs contend that their payment of the late fees was involuntary for reasons other than the allegedly penal nature of the fees. Accordingly, remand to the trial court is appropriate so that it may determine the effect of BMG's voluntary-payment defense on the requirements for class certification. If the trial court determines that common issues will predominate in resolving the voluntary-payment defense, then the court should explain why and describe how the voluntary-payment issues will be tried.

## VI. Conclusion

For the foregoing reasons, we decertify the class that the trial court certified and remand the case to the trial court for proceedings consistent with this opinion.

Justice HECHT filed a concurring opinion.

Justice WAINWRIGHT filed a concurring opinion.

### Justice HECHT, concurring.

I agree with the Court that "the voluntary-payment doctrine's full-knowledge requirement has been met" in this case, and that "the classmembers' unlawful-penalty allegation, under the circumstances presented here, does not implicate the type of fraud, duress or coercion that would preclude the voluntary-payment defense".[1] All of the class's arguments thus having been rejected, and a dispositive defense having been conclusively established, the class cannot proceed on any claim it has asserted (those being only for damages, not injunctive relief), and the case is at an end. Because this is an interlocutory appeal from a class certification order, this Court cannot issue a judgment on the merits, so it remands the case to the trial court with the elliptic direction to "determine the effect of BMG's voluntary-payment defense on the requirements for class certification".[2] Since "dispositive issues should be resolved by the trial court before certification is considered",[3] and now the Court has resolved a dispositive issue for the trial court, there is nothing left for the trial court to do but dismiss the case. I concur in remanding the case for that purpose.

### Justice WAINWRIGHT, concurring.

The Court holds that a CD purchaser who pays a void late fee to a music company makes a voluntary payment that he cannot recover, even if he does not know that the fee was void when charged and cannot legally be collected. Under the voluntary payment rule, "it is well settled that money paid under a mistake of law with respect to liability to make payment, but with full knowledge of all the facts on which the claim for payment is based, and on which the right to resist it depends, cannot be recovered." *Gilliam v. Alford,* 69 Tex. 267, 6 S.W. 757, 759 (1887). Here, the application of the voluntary payment rule rewards the wrongdoer and punishes the innocent. The innocent purchaser paid what he was billed; the music company wrongfully billed him for late fees in the contract; and yet the purchaser loses. Application of the voluntary payment rule in the private sector lacks justification and is counterintuitive.

Consider two examples. Along with millions of other Texans, I paid my utility bill in October. When the cold front came through, it reminded me that I needed to pay my monthly utility bill. Having forgotten about the check I wrote a few weeks earlier, I paid the October utility bill again. In a second example, as I paid my October utility bill I noticed that it included an additional fee under a new statute. Unbeknownst to me at the time, the statute was void and later was declared unconstitutional. There was no threat of shutoff from the utility company in either case. A reasonable person would think that if I made a payment I was not obligated to make, I should be able to recoup it in both cases. Not so under the rationale of the voluntary payment rule. I

---

**1.** *Ante* at 778.

**2.** *Id.* at 778.

**3.** *State Farm Mut. Auto. Ins. Co. v. Lopez,* 156 S.W.3d 550, 557 (Tex.2004).

paid twice under a "mistake of fact" in the first circumstance and can recover the duplicate payment, but in the second example I paid under a "mistake of law" and am barred from recovery.

The American Law Institute and some courts have recognized that the distinction between mistake of law and mistake of fact is artificial. The Indiana Supreme Court observed:

> [W]e are sympathetic to contemporary scholarly opinion that suggests the distinction between a mistake of law and a mistake of fact is artificial. While the American Law Institute's 1937 Restatement of Restitution is frequently cited for the distinction, the current tentative draft of a new Restatement of Restitution & Unjust Enrichment (Third) eliminates it. The tentative draft—correctly, we think, limits application of the voluntary payment doctrine to situations where a party has voluntarily paid a disputed amount.

*Time Warner Entm't Co. v. Whiteman,* 802 N.E.2d 886, 891 (Ind.2004) (footnotes omitted) (comparing Restatement of Restitution § 45 (1937) with Restatement (Third) of Restitution & Unjust Enrichment § 6(2) (Tentative Draft No. 1, 2001)).

The more familiar doctrines of estoppel, quasi estoppel, and waiver preclude recovery of voluntary payments in some circumstances. For example, if a person makes a payment intending to mislead another who detrimentally relied on the payment, the doctrine of estoppel prevents the payor from recovering the payment. *See Airline Commerce Bank v. Wilburn,* 609 S.W.2d 813, 815 (Tex.Civ.App.-Houston [14th Dist.] 1980, no writ). Quasi estoppel creates a similar bar but lacks the requirements of misrepresentation or detrimental reliance and instead focuses on the unconscionability of demanding return of the payment after the payor received a bene-

fit. *See Steubner Realty 19, Ltd. v. Cravens Road 88, Ltd.,* 817 S.W.2d 160, 164 (Tex.App.-Houston [14th Dist.] 1991, no writ). Waiver occurs when a person intentionally relinquishes a known right, such as paying a bill that both sides dispute. *See Tenneco Inc. v. Enter. Prods. Co.,* 925 S.W.2d 640, 643 (Tex.1996) (defining waiver). In fact, estoppel and waiver seem to be the basis of the voluntary payment doctrine. *See Brown v. Oaklawn Bank,* 718 S.W.2d 678, 681 (Tex.1986) (rejecting voluntary payment defense when payee had not detrimentally relied on the payment); *Ladd v. Southern Cotton Press & Mfg. Co.,* 53 Tex. 172, 192–94 (1880) (continuing payments with full knowledge of the facts surrounding the transaction, without fraud or duress, waives payor's right to complain at a later date); *R.G. McClung Cotton Co. v. Cotton Concentration Co.,* 479 S.W.2d 733, 743 (Tex.Civ. App.-Dallas 1972, writ ref'd n.r.e.) (recognizing that in some cases the payor is allowed to recover a "voluntary" payment if "he clearly never intended to surrender his position"); *West Tex. State Bank v. Tri–Service Drilling Co.,* 339 S.W.2d 249, 253 (Tex.App.-Eastland 1960, writ ref'd n.r.e.) (recovering a voluntary payment depends upon whether there was an intention by the payor to waive his rights). These doctrines that preclude recovery of a payment in appropriate situations are well-known and justifiable. We need not employ a legal artifice on unsteady footing to bar innocent persons from justly recovering payments in private transactions.

The Court attempts in the opinion to address an additional concern. It strains to keep the voluntary payment doctrine narrow and emphasizes that it is rarely applicable. The Court states that we have not applied the doctrine in over 40 years. 178 S.W.3d 763, 772. However, I hope that the Court has not awakened a sleep-

ing giant who will seek to interpose the voluntary payment defense to retain payments made by many an innocent purchaser. I would have preferred that rather than applying a dormant doctrine, the Court considered whether the doctrine has a legitimate basis for continued viability in private disputes. The only rationale the Court cites for applying the voluntary payment rule in the private sector is that it "allows entities to rely on contractually agreed-upon late fees received from customers." *Id.* at 772. This is slim justification to allow a seller to keep payments that both he and the purchaser know are not warranted.

On the other hand, the voluntary payment rule for public fees has well-established practical and legal underpinnings, and it is not complicated by distinctions between legal and factual mistakes as it is in the private sector. It has been applied to taxes for over a century.[1] *See City of Houston v. Feizer,* 76 Tex. 365, 13 S.W. 266, 267–68 (1890). In the taxation context, the rule assists taxing authorities in the orderly conduct of their financial affairs. *Feizer,* 13 S.W. at 267; *see also Salvaggio v. Houston Indep. Sch. Dist.,* 752 S.W.2d 189, 193 (Tex.App.-Houston [14th Dist.] 1988, writ denied). The U.S. Supreme Court also has recognized the "government's exceedingly strong interest in financial stability" and that unpredictable revenue shortfalls can threaten a state's financial security. *McKesson Corp. v. Div. of Alcoholic Bevs. & Tobacco, Dep't of Bus. Regulation of Fla.,* 496 U.S. 18, 37, 110 S.Ct. 2238, 110 L.Ed.2d 17 (1990). The rule also supports the age-old policies of discouraging litigation with the government. *See Austin Nat'l Bank v. Sheppard,* 123 Tex. 272, 71 S.W.2d 242, 246 (1934); *see also Salvaggio,* 752 S.W.2d at 193. The Court cites no such interests in

the private sector for the viability of the voluntary payment rule, and although it states that applying the voluntary payment rule in this case follows the majority rule, that majority is populated by only seven states.

I recognize that the voluntary payment rule has not been modified or abolished in the private sector in Texas, that there are precedents for its application, and that the difficult distinctions between mistakes of law and mistakes of fact that determine whether the rule applies still exist. But we should consider carefully the viability of such a rule in a modern era when the well-known doctrines of estoppel and waiver are available to ensure just outcomes in these cases. Before precluding an innocent purchaser from recovering her mistaken payment from a wrongdoer, we should at least require that the purchaser in some manner harmed the seller or knowingly waived rights to the funds. The voluntary payment rule currently requires neither. Because I have serious concerns about the continued viability of the voluntary payment doctrine in private transactions and the rationale for its existence, I join only the Court's judgment.

---

1. The rule has been abrogated by statute in most areas of taxation.